HAVANA CLUB HOLDING, S.A. and Havana Club International, S.A., Plaintiffs,

v.

GALLEON S.A., Bacardi–Martini USA, Inc., Gallo Wine Distributors, Inc., G.W.D. Holdings, Inc. and Premier Wine and Spirits, Defendants.

No. 96 Civ. 9655(SAS).

United States District Court, S.D. New York.

March 10, 1997.

Michael Krinksy, Caroline Rule, Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C., New York City, for Plaintiffs.

William R. Golden, Jr., Kelley Drye & Warren, LLP, New York City, for Defendants.

*MEMORANDUM OPINION*

SCHEINDLIN, District Judge.

## I. INTRODUCTION

### A. The Pending Motion

Plaintiff Havana Club Holding, S.A. ("HC Holding"), owner of a United States registra-

tion of the trademark "Havana Club," and Plaintiff Havana Club International, S.A. ("HCI"), exclusive licensee of that trademark, seek to enjoin Defendants Galleon S.A., Bacardi–Martini USA, Inc., Gallo Wine Distributors, Inc., G.W.D. Holdings, Inc. and Premier Wine and Spirits (collectively "Defendants") from using the words "Havana Club" as part of any trademark, service mark, brand name, trade name or other business or commercial designation in connection with the sale, distribution, advertising or promotion of rum or rum products in the United States. Plaintiffs allege that such use violates their respective rights under Sections 32 and 43 of the Lanham Act, 15 U.S.C. §§ 1114 & 1125, and have moved for a preliminary injunction pursuant to Fed.R.Civ.P. 65.

In connection with their affirmative defenses and counterclaims, Defendants allege, *inter alia*, that Plaintiff HC Holding secured its alleged rights to the "Havana Club" mark in violation of the Cuban Asset Control Regulations ("CACR"), 31 C.F.R. Part 515, and the Lanham Act, 15 U.S.C. §§ 1059, 1064(3), 1120. Specifically, Defendants contend that the license HC Holding obtained from the United States Department of the Treasury's Office of Foreign Asset Control ("OFAC") authorizing the assignment of the Havana Club mark was procured by fraud.[1] Defendants assert that as a result, the assignment of the Havana Club mark to HC Holding is null and void, and HC Holding has no rights in the mark.

Plaintiffs' motion for a preliminary injunction is currently pending. I write at this stage of the proceedings only to consider the issue of whether this Court has the power to review OFAC's issuance of this license, and if so, whether this review might result in invalidating the license. At the Court's request, the parties briefed this issue by way of letters each submitted to the Court on February 21, 1997.

### B. The Cuban Embargo

The CACR were implemented in 1963 under Section 5(b) of the Trading With the

---

1. The series of assignments and the issuance of    the license is described more fully below.

Enemy Act of 1917 ("TWEA"), as amended, 50 U.S.C.App. 1–44. Section 5(b) afforded the President "broad authority to impose comprehensive embargoes on foreign countries as one means of dealing with both peacetime emergencies and times of war." *Regan v. Wald,* 468 U.S. 222, 225–26, 104 S.Ct. 3026, 3029–30, 82 L.Ed.2d 171 (1984). The CACR, one such embargo, were adopted in response to alleged Cuban efforts to destabilize Latin American governments. *Id.* at 226, 104 S.Ct. at 3029 (citing Presidential Proclamation No. 3447, 3 C.F.R. 157 (1959–1963 Comp.)).

Section 5(b) was amended in 1977 to limit the President's authority to times of war. *See* Title I, Pub.L. No. 95–223, § 101, 91 Stat. 1625. The same bill, however, enacted a new law that now covers the President's powers in response to peacetime crises. *See* International Emergency Economic Powers Act, 50 U.S.C. §§ 1701–06 ("IEEPA"). Although the IEEPA and TWEA differ significantly with respect to the conditions and procedures required for the President's exercise of his peacetime authority, these differences are not relevant for present purposes. The IEEPA grandfathered the existing exercises of the President's "national emergency" authority, *see* Pub.L. 95–223, § 101(b), 91 Stat. 1625, as well as permitting the President to extend its exercise at one-year intervals provided that such an extension "is in the national interest." Pub.L. 95–223, § 101(c), 91 Stat. 1625.[2] The recently enacted Cuban Liberty and Democratic Solidarity ("LIBERTAD") Act of 1996, codified at 22 U.S.C. §§ 6021–24, 6031–46, 6061–67, 6081–85, 6091, prescribes certain conditions that must occur in Cuba before the President may lift the embargo, including the transition to a democratically elected government, and requires the President to consult with Congress before lifting it. *See* 22 U.S.C. §§ 6061, 6064–6066. This Act continues the embargo indefinitely and suspends the IEEPA's requirement that the President revisit the embargo each year. *See* 22 U.S.C. § 6032(h) (providing that all restrictions under the CACR's shall remain in effect until a democratically elected government is in power in Cuba).[3]

The President had delegated his powers under the TWEA to the Secretary of the Treasury in 1942, who, in 1962, delegated the administration of foreign assets control regulation to OFAC. *See Sardino v. Federal Reserve Bank of New York,* 361 F.2d 106, 109 n. 2 (2d Cir.), *cert. denied,* 385 U.S. 898, 87 S.Ct. 203, 17 L.Ed.2d 130 (1966). OFAC remains responsible for executing and enforcing economic embargoes and sanctions programs against several countries. *See Free Trade with Cuba Act, Hearings on H.R. 2229 Before the Subcomms. on Select Revenue Measures and Trade of the House Comm. on Ways and Means,* 103rd Cong. 99 (1994) (statement of R. Richard Newcomb, Director of OFAC) ("Newcomb Test."). In that capacity, OFAC administers the embargo against Cuba pursuant to the CACR.

The CACR prohibit transfers of property, including trademarks, in which a Cuban entity has an interest, except when specifically authorized by the Secretary of the Treasury. 31 C.F.R. §§ 515.201(b), 515.311. Licenses of the type at issue in this matter are one such type of authorization. *Id.* The CACR creates both general licenses, which permit classes or categories of transactions with Cuban nationals, *see, e.g., id.* § 515.542 (authorizing "[a]ll transactions of common carriers incident to the receipt of mail between the United States and Cuba"), and specific licenses, which require individualized determinations and approval by OFAC. *See id.* § 515.801. OFAC, acting on behalf of the President, enjoys considerable discretion to authorize otherwise prohibited transactions by way of licenses. *See id.* § 515.801(b)(6).[4]

---

**2.** Presidents Carter, Reagan, Bush and Clinton have each done so. *See* 43 F.R. 40449 (1978); 44 F.R. 53153 (1979); 45 F.R. 59549 (1980); 46 F.R. 45321 (1981); 47 F.R. 40695 (1982); 48 F.R. 40695 (1983); 49 F.R. 35927 (1984); 50 F.R. 36563 (1985); 51 F.R. 30201 (1986); 52 F.R. 33397 (1987); 53 F.R. 35289 (1988); 54 F.R. 37089 (1989); 55 F.R. 37309 (1990); 56 F.R. 48415 (1991); 57 F.R. 43125 (1992); 58

F.R. 51209 (1993); 59 F.R. 47229 (1994); 60 F.R. 47659 (1995); 61 F.R. 46529 (1996).

**3.** The Cuban Liberty and Democratic Solidarity Act is discussed in more detail below.

**4.** This provision states:
*Issuance of License.* [Specific] [l]icenses will be issued by [OFAC] acting on behalf of the

Moreover, OFAC has the same discretion to amend, modify or revoke both the licensing provisions of the CACR, as well as individual licenses, at any time. *Id.* § 515.805.

The wisdom of maintaining the Cuban embargo that the CACR embody some 35 years after its inception has come under serious attack from many camps and on many grounds in recent months. The embargo has been harshly criticized by several United States allies (including Mexico, Canada, and the European Union), a delegation from the United States Association of Former Members of Congress, the American Association for World Health, and notably, one of the embargo's original architects, Arthur Schlesinger, Jr., former special advisor to President Kennedy. *See* Jack Nelson, *Embargo in Cuba Exacts a "Tragic Human Toll"*, L.A. Times, March 3, 1997, at A4; David E. Sanger, *U.S. Won't Offer Trade Testimony on Cuba Embargo*, N.Y. Times, Feb. 21, 1997, at A1; William E. Gibson & Deborah Ramirez, *Cuban Embargo Intact after 35 Years*, Houston Chronicle, Feb. 9, 1997, at 34; *After Cuba Trip, U.S. Group Sees Castro Keeping Power*, Boston Globe, Jan. 10, 1997, at A9; Editorial, *A Frozen Approach to Cuba*, Jan. 10, 1997, at A32. Much of the controversy has been churned up in the wake of the recent passage of the Cuban Liberty and Democratic Solidarity Act ("the Act"). The Act has further tightened the embargo in what its critics view as a profoundly misguided attempt to topple the Castro regime.[5]

> Secretary of the Treasury, acting in accordance with such regulations, rulings, and instructions as the Secretary ... or [OFAC] may from time to time prescribe, in such cases as the Secretary ... or [OFAC] may determine, or licenses may be issued by the Secretary acting directly or through any person, agency, or instrumentality designated by him.

5. According to press reports, what is most objectionable and onerous to United States allies is Title III of the Act, which creates a civil cause of action in United States courts against any person who "traffics" in property confiscated by the Cuban government since January 1, 1959, on behalf of any United States national who has a claim for such property. *See* 22 U.S.C. §§ 6081–84. Trafficking includes selling, transferring, buying, leasing, as well as "engag[ing] in a commercial activity using or otherwise benefitting from confiscated property." *Id.* at § 6023(13). The response of Canada, Mexico and Europe, all

This new legislation reiterates some standard rationales for the embargo—among them protecting national security and ending Castro's regime—rationales that, according to its detractors, have endured longer than the embargo's "success" justifies and outlived whatever usefulness they may once have possessed. The *Los Angeles Times* reports that the American Association for World Health's ("AAWH") year long study of Cuba has concluded that the embargo itself has led to increased suffering and death in Cuba, a condition that has been aggravated by the passage of the Act. *See* Jack Nelson, *Embargo in Cuba Exacts a "Tragic Human Toll"*, L.A. Times, March 3, 1997, at A4. For example, the article relates that according to the AAWH, screening and treatment for breast cancer has been severely compromised by the embargo, to the point that the entire screening program was halted in both 1994 and 1995 due to a shortage of x-ray film. *Id.* The study charges, according to the *Los Angeles Times*, that the embargo has contributed to cutbacks of supplies of safe drinking water due to a lack of equipment and chemicals, which has in turn led to increased outbreaks of typhoid fever, dysentery, and viral hepatitis. *Id.*

Critics also question the embargo's continued relevance to and impact on our national security. Some contend that the enduring presence of the embargo is counterproductive, only strengthening Castro's grip on

of which do extensive business with Cuba, has been likened to nothing less than "outrage." *See* Sanger, *supra*, at A7. Each country has passed laws that prohibit their businesses from paying any sanctions imposed under the Act. *See id.; see also* Editorial, *A Frozen Approach to Cuba*, *supra*. For the present, these provisions are not in effect, as the President has suspended the effective date pursuant to § 6085, which allows for such suspension for periods of six months from the Act's effective date.

The press further reports that an additional thorn in the side of our allies is that the Act also mandates that executives of foreign companies that conduct business in Cuba in violation of its provisions be barred from entering the United States. *Id.* at § 6091. The *New York Times* reports that Executives from Canada and Mexico have already been barred under this section, while executives from Italy are expected to be barred soon. Sanger, *supra*, at A7.

Cuba by furnishing an all-purpose excuse for any and all of Cuba's ills. *See* William E. Gibson & Deborah Ramirez, *Cuban Embargo Intact after 35 Years*, Houston Chronicle, Feb. 9, 1997, at 34. In a recent Letter to the Editor of the New York Times, Mr. Schlesinger charged:

> As one involved in the Kennedy Administration's Cuban policy, may I note that the United States embargo was laid down at a time when Cuba was a Soviet base and when it was organizing attempts to overthrow other Latin American governments. Neither condition obtains today.
>
> In 1963 President Kennedy authorized an exploration of possible rapprochement with Cuba, making it clear that once Fidel Castro receded from the Soviet connection and stopped troublemaking in the hemisphere, normalization would be possible. . . .
>
> A better policy [than preserving the embargo] would be to repeal Helms–Burton, lift the embargo and drown the regime in American tourists, investments, and consumer goods.

Arthur Schlesinger Jr., Letter to the Editor, N.Y. Times, Feb. 21, 1997, at A22.

The effectiveness of the Cuban embargo has been and continues to be open to debate. Were there no embargo, the issue raised by Defendants would be moot. However, the decision of whether and in what manner to continue the embargo is delegated to the legislative and executive branches. The recent passage of legislation reinforcing the embargo attests to its continued viability for the foreseeable future. As such, for the reasons stated below, I conclude that this Court is not an appropriate forum for Defendants' challenge to the validity of Plaintiffs' license because this Court lacks the power to review the issuance of a license duly authorized by OFAC.

## II. BACKGROUND

### A. Havana Club Rum and Trademark

Havana Club rum, produced in Cuba and distributed under the Havana Club trademark, has been exported to over twenty countries since 1973. *See* Declaration of Luis Francisco Perdomo Hernandez ("Perdo-

mo Decl."), Vice Chairman of the Board of Havana Club Holding, S.A., dated Nov. 30, 1996, ¶ 4; Declaration of Maria del Carmen Abarrategui Goicolea ("Abarrategui Decl."), Director of Market Research from 1975–80 and Vice President from 1980–93 of Cuban Export Enterprise of Food and Various Products d/b/a Cubaexport ("Cubaexport"), dated Nov. 30, 1996, at § 6. According to Plaintiffs, the sole reason Havana Club rum is not currently sold in this country is because United States law prohibits its importation, except as accompanying baggage of a returning United States visitor to Cuba pursuant to the embargo discussed above. *See* 31 C.F.R. § 515.560(c)(3); Complaint ¶ 27; Perdomo Decl. ¶¶ 9–12; Abarrategui Decl. ¶¶ 11–12, 18. Plaintiffs assert that since 1973, the owners of the Havana Club rum business have intended to sell Havana Club rum in the United States as soon as it is legally possible to do so. Complaint ¶ 27. At present, the principal markets for Havana Club rum are Western Europe, Canada, and Mexico, although Havana Club is also sold in Central and South America, and in other markets. *Id.* at ¶ 25.

Under Section 44 of the Lanham Act, foreign entities are permitted to register trademarks in the United States. 15 U.S.C. § 1126. Pursuant to Section 44, the Havana Club mark was registered in the United States in 1976 by Cubaexport, a Cuban state enterprise, based on Cubaexport's registration of the mark in Cuba. Complaint ¶ 17; 15 U.S.C. 1126(c). Cubaexport continued to market Havana Club rum internationally from 1972 until 1993. Perdomo Decl. ¶ 2.

In 1993, Cubaexport's Havana Club rum business was reorganized to incorporate a foreign partner. *Id.* Cubaexport reached an agreement with Pernod Ricard, S.A. ("Pernod"), an international distributor of liquor, to form two companies: (1) HC Holding, of which 50% equity and board representation was to be held by a newly formed Cuban company, Havana Rum & Liquors, S.A., and 50% was to be held by Pernod; and (2) HCI, which has a 50–50 breakdown of equity between Havana Rum & Liquors and Pernod, both through direct holdings and through holdings in HC Holding. *Id.* Plaintiffs allege

that all of the assets associated with the Havana Club rum business, including the Havana Club trademark, were transferred as part of this reorganization by Cubaexport to Havana Rum & Liquors, which then transferred them to HC Holding. *Id.* HC Holding then granted HCI an exclusive license to sell Havana Club rum and to use the Havana Club trademark. After the reorganization, upon application by HC Holding, the United States Patent and Trademark Office ("PTO") in June 1996 renewed the registration of the Havana Club mark for a term of ten years that commenced on January 27, 1997. Declaration of Caroline Rule, attorney for Plaintiffs, dated Dec. 30, 1996, at ¶¶ 5, 6; Exs. A, B. The transfer of the trademark in the 1993 reorganization of Cubaexport's Havana Club business was governed by the CACR.

### B. The Current Controversy

On October 5, 1995, Plaintiffs applied to OFAC for a specific license authorizing the assignment of the Havana Club mark as described above, *i.e.* from Cubaexport to Havana Rum & Liquors to HC Holding. *See* Reply Affidavit of Michael Krinsky ("Krinsky Aff."), attorney for Plaintiffs, Ex. A. OFAC responded by issuing License No. C–18147, which approved the assignment.[6] *See id.*

Defendants now attempt to challenge the validity of License No. C–18147, alleging that Plaintiffs falsely represented in their license application that "[t]he aforesaid assignments were part of the reorganization of the Cuban rum and liquors industry and each of the assignors and assignees are nationals of Cuba." Defendants assert that the 1993 reorganization of the Havana Club rum business, of which the assignment of the Havana Club mark was a part, was not an internal Cuban reorganization, and that Plaintiffs' representation to OFAC was therefore misleading. Defendants notified OFAC in August 1996 of their belief that the Havana Club trademark

assignments were made in violation of the CACR.[7] See Affidavit of Ignacio E. Sanchez ("Sanchez Aff."), attorney for Defendants, dated January 21, 1997, Ex. 1. OFAC responded in December 1996 that "a review of our licensing files shows no license was issued to authorize the assignment as described in your letter." Sanchez Aff., Ex. 2. However, Defendants' correspondence with OFAC did not mention License No. C–18147.

## III. DISCUSSION

Defendants ask this Court to resolve the license dispute in the context of this trademark infringement action. I decline to do so for several reasons. First, Defendants lack standing to challenge OFAC's issuance of the license. Second, given that the CACR are an instrument of foreign policy, OFAC's issuance of or failure to revoke a license rests upon foreign policy considerations and judgments of the Executive Branch that should not be disturbed by the courts. Third, the Administrative Procedure Act ("APA") precludes judicial review of matters "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The issuance or revocation of licenses by OFAC is committed to OFAC's discretion and is thus unreviewable by this Court.

### A. Standing

"[T]he irreducible constitutional minimum of standing" consists of three factors: 1) injury in fact, which requires the infringement of a legally protected interest that is "concrete and particularized" as well as "actual or imminent, not 'conjectural' or 'hypothetical'"; 2) a causal connection between the injury and the offending conduct—*i.e.* the injury must not result from "the independent action of some third party not before the court;" and 3) redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112

---

**6.** License No. C–18147 contains what appears to be a typographical error, in that it purports to approve the assignment of the mark from Havana Club to Havana Rum & Liquors and then to HC Holding rather than from Cubaexport to the other companies. *See* Krinsky Aff., Ex. A. Aside from the fact that the license would make no sense if this were not a typographical error, the license refers explicitly to the Plaintiffs' applica-

tion of October 5, 1995, which correctly identifies the transaction at issue.

**7.** Plaintiffs, of course dispute Defendants' characterization of the 1993 transaction, and contend that this characterization differs in ways that were material to OFAC at the time OFAC issued the license.

S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (citations omitted). To establish standing to challenge agency action under the APA, in addition to showing injury in fact, a party must show that "the injury he complains of (*his* aggrievement, or the adverse effect *upon him* ) falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Air Courier Conference of America v. American Postal Workers Union AFL–CIO*, 498 U.S. 517, 523, 111 S.Ct. 913, 917, 112 L.Ed.2d 1125 (1991) (citations omitted). *see also Gosnell v. Federal Deposit Ins. Co.*, 938 F.2d 372, 375 (2d Cir.1991). Moreover,

> In cases where the plaintiff is not itself the subject of the contested regulatory action, the [zone of interests] test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot be assumed that Congress intended to permit the suit.

*Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 399, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987).

■ Simply put, Defendants seek to challenge an agency action which has only a marginal impact on them. The following facts prove the point. OFAC, enforcing the terms of the embargo against Cuba on behalf of the President, licensed a series of assignments of the Havana Club mark. Plaintiffs' continued registration of the Havana Club mark in the United States hinders Defendants' plan to use the words "Havana Club" to identify their own rum. On these facts, Defendants cannot tenably argue that they fall within the "zone of interests" of the CACR.

Indisputably, Defendants were not the subject of the OFAC action they now seek to challenge, and therefore must show that they fall within the CACR's "zone of interests". That "zone" encompasses the range of foreign policy concerns that make up United States–Cuban relations. The embargo defined by the CACR functions as an important instrument of United States foreign policy with Cuba. *See* Newcomb Test. at 99. Those foreign policy considerations clearly do not include Defendants' interest in clearing the path for their use of the Havana Club mark. Because Defendants were not a party to the licensing proceeding, and because they are not otherwise within the "zone of interests" of the CACR, Defendants lack standing to challenge OFAC's action in this Court.

**B. Foreign Policy**

■ As the Supreme Court reconfirmed when it upheld the validity of restrictions on travel to Cuba under the CACR, "[m]atters relating 'to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'" *Regan*, 468 U.S. at 242, 104 S.Ct. at 3038 (citing *Harisiades v. Shaughnessy*, 342 U.S. 580, 589, 72 S.Ct. 512, 519, 96 L.Ed. 586 (1952)). OFAC acts under the aegis of the President's foreign policy power; the CACR are a powerful tool for exercising that power. OFAC consults with other federal agencies, including the State Department and the National Security Council, "to ensure that the [O]FAC mandate is properly implemented and effectively enforced." Newcomb Test. at 99. The State Department provides OFAC with foreign policy guidance with respect to sensitive cases. *Id.* The National Security Council offers guidance on significant policy questions. Both agencies consult with OFAC on the promulgation and amendment of regulations. *Id.* Considering that OFAC's actions as an Executive Branch agency rest upon sensitive foreign policy concerns, the courts should not lightly take on the role of second-guessing its determinations.

In their letter brief, Plaintiffs outline some plausible policy concerns that might dictate OFAC's consideration of assignments of trademarks. First, issues of reciprocity may arise in the context of trademark assignments, considering that United States companies have registered over 400 brands of products in Cuba pursuant to an OFAC general license found in 31 C.F.R. § 515.528. *See* Declaration of Sara Marta Diaz Rodriguez ("Rodriguez Decl."), head of the legal department of the Chamber of Commerce of the Republic of Cuba, dated January 29, 1997, at ¶ 3; Address of Carlos Lage Davila, Vice–

President of the Council and State and Secretary of the Council of Ministers of the Republic of Cuba, to the General Assembly of the United Nations, 51st Sess., Nov. 12, 1996. Cuban authorities permit United States companies to assign their registered Cuban marks after mergers, acquisitions, and other reorganizations of businesses. Rodriguez Decl. at ¶ 4.

■ Second, the purposes underlying the CACR may be implicated in a unique manner by the assignment of intellectual property such as trademarks. The purposes of the CACR include 1) preventing the Cuban government from acquiring dollars; 2) providing assets from which United States citizens can be compensated for wrongs committed by the Cuban government; and 3) using blocked assets as a negotiating tool with the Cuban government. *See Richardson v. Simon*, 560 F.2d 500, 505 (2d Cir.1977), *appeal dismissed*, 435 U.S. 939, 98 S.Ct. 1516, 55 L.Ed.2d 536 (1978). As recently as 1996, the embargo has been described as essential to maintaining national security and unseating the Castro regime. *See* 22 U.S.C. § 6022;[8] *see also* Sanger, *supra*, at A1, A7.

■ In the trademark context, the value of the Havana Club mark would be destroyed were the entire Havana Club business, including the good will of the business, to be transferred without the Havana Club mark. As a matter of law, a trademark separated and sold apart from its good will—an assignment in gross—has no value. *See Marshak v. Green*, 746 F.2d 927, 929 (2d Cir.1984). The assignment of trademarks therefore raises the specter of the destruction of blocked assets, assets which otherwise would function as bargaining chips in United States relations with Cuba. The weight to be placed on this consideration when determining whether or not to license the assignment of a trademark is within OFAC's discretion. The

President has designated OFAC, and not the courts, to perform that function.

Finally, the prohibitions of the CACR are "loosened and tightened" in response to developments in United States–Cuban relations having little or nothing to do with the transactions being regulated. *Regan*, 468 U.S. at 222, 104 S.Ct. at 3026. As the Fifth Circuit noted in *Spacil v. Crowe* 489 F.2d 614, 619 (5th Cir.1974), "in the chess game that is diplomacy only the executive has a view of the entire board and an understanding of the relationship between isolated moves." The judiciary, by contrast, does not have a role to play in diplomacy.

## C. The APA

■ The APA precludes judicial review of agency action that is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Under § 701(a)(2), "[i]f the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," judicial review is precluded. *Heckler v. Chaney*, 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985). Here, as noted above, OFAC enjoys considerable discretion in granting or revoking licenses. *See* 31 C.F.R. §§ 515.801(b)(6); 515.805. The CACR permit OFAC to amend, modify, or revoke a license at any time, on its own initiative. *Id.* at § 515.805. They do not specify grounds upon which amendment, modification revocation must be based, but rather, leave that decision to the discretion of OFAC. *Id.* Moreover, the CACR grant OFAC the authority to take such action *sua sponte*. Because OFAC's decisions to grant and revoke licenses are committed to OFAC's discretion by law, OFAC's licensing actions are not reviewable under the APA.

## IV. CONCLUSION

For the foregoing reasons, I find that OFAC's issuance of License No. C–18147 is

---

8. This section provides in relevant part:
    The purposes of this Act are—
    (1) to assist the Cuban people in regaining their freedom and prosperity . . .
    (2) to strengthen international sanctions against the Castro government; [and]
    (3) to provide for the continued national security of the United States in the face of continuing threats from the Castro government of terrorism, theft of property from United States nationals by the Cuban government, and the political manipulation by the Castro government of the desire of Cubans to escape that results in mass migration to the United States. . . .
  22 U.S.C. § 6022.

not reviewable by this Court. In so finding, I make no determination on the merits of Defendants' claim that the license was procured by fraud, or is otherwise null and void under the CACR. Defendants, of course, are free to pursue their concerns with OFAC, as they have already sought to do.

SO ORDERED: