HAVANA CLUB HOLDING, S.A. and
Havana Club International, S.A.,
Plaintiffs,

v.

GALLEON, S.A., Bacardi–Martini U.S.A., Inc., Gallo Wine Distributors, Inc., G.W.D. Holdings, Inc. and Premier Wine and Spirits, Defendants.

No. 96 Civ. 9655(SAS).

United States District Court,
S.D. New York.

June 28, 1999.

Michael Krinsky, Debra Evenson, Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C., New York, NY, Charles Sims, Chuck Reed, Proskauer Rose LLP, New York, NY, Richard Huffman, Baden, Kramer, Huffman & Brodsky, New York, NY, for Plaintiffs.

William R. Golden, Paul F. Doyle, Sarah L. Reid, Margaret Ferguson, Michelle Graham, Kelley Drye & Warren LLP, New York, NY, for Defendants.

*AMENDED OPINION AND ORDER*

SCHEINDLIN, District Judge.

At the heart of this case lies an interesting irony: a half-Cuban company, Havana Club International, S.A., brings an action to enjoin what it believes is unfair competition and to preserve its ability to some day compete in the United States market. Plaintiffs currently distribute a Cuban-origin rum around the world under the name "Havana Club," but are prohibited from selling their liquor in the United States because of the Cuban embargo. Defendants own Bacardi rum, the best-selling brand of spirits in this country, and claim to be the successors-in-interest to the rights of the Cuban company that owned the Havana Club rum business prior to its expropriation by the Castro government in 1960. Through this action, plaintiffs seek to enjoin defendants from selling rum under the name "Havana Club" in the United States.

## I. Background

### A. The Parties

Plaintiff Havana Club International, S.A. ("HCI") is a joint stock company organized under the laws of the Republic of Cuba, and is domiciled and has its principal place of business in Cuba. Plaintiff Havana Club Holding, S.A. ("HCH"), a holding company that owns the Havana Club trademark in certain countries outside the United States, is a corporation organized under the laws of Luxembourg. Plaintiffs were formed in connection with a November 1993 agreement ("Convenio Asociativo") between Pernod Ricard, S.A. ("Pernod Ricard"), a French Company, and Havana Rum & Liquors, S.A. ("HRL"), a Cuban company. Pursuant to the Convenio Asociativo, Pernod Ricard and HRL each own 50% of HCH and, directly and through

their ownership interests in HCH, each own 50% of HCI.

Defendant Galleon, S.A. has been merged into defendant Bacardi and Company Limited ("Bacardi & Co."), which is organized under the laws of Liechtenstein and is headquartered in the Bahamas. Bacardi–Martini U.S.A. ("Bacardi–Martini," and together with Bacardi & Co., "Bacardi") is incorporated in Delaware.

### B. Procedural Background

As explained in this Court's three previous opinions in this case, plaintiffs currently have no rights to the use of the Havana Club trademark. *See Havana Club Holding, S.A. v. Galleon, S.A.,* 961 F.Supp. 498 (S.D.N.Y.1997); *Havana Club Holding, S.A. v. Galleon, S.A.,* 974 F.Supp. 302 (S.D.N.Y.1997); *Havana Club Holding, S.A. v. Galleon, S.A.,* 96 Civ. 9655, 1998 WL 150983 (S.D.N.Y. March 31, 1998). A bench trial was held before this Court on plaintiffs' remaining claims: (1) that defendants' sales of Havana Club rum infringe plaintiffs' trade name in violation of Chapter III of the General Inter–American Convention for Trademark and Commercial Protection, 46 Stat. 2907 ("Inter–American Convention"); (2) that defendants' sales of Havana Club rum infringe plaintiffs' trade name in violation of §§ 44(g) and 44(h) of the Lanham Act, 15 U.S.C. §§ 1126(g) and (h);[1] and (3) that defendants' Havana Club rum is geographically misdescriptive because it leads consumers to erroneously believe that it originates in Cuba, in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Plaintiffs seek no money damages, only injunctive relief and attorney's fees and costs. In defending against plaintiffs' § 43(a) claim, defendants assert the affirmative defense of "unclean hands," on the basis that plaintiffs have used ingredients of

---

**1.** Section 44(g) provides that "[t]rade names or commercial names of persons described in subsection (b) of this section shall be protected without the obligation of filing or registration whether or not they form parts of

marks." 15 U.S.C. § 1126(g). Section 44(h) ensures that any person whose country of origin is a party to a trademark treaty with the United States shall be entitled to "effective protection against unfair competition."

non-Cuban origin in a significant amount of their "Cuban" rum.[2]

Following the close of plaintiffs' case, defendants made a motion for judgment pursuant to Fed.R.Civ.P. 52(c) on a variety of grounds. The Court granted the motion as to plaintiff HCH on its tradename claims, on the ground that HCH is organized under the laws of Luxembourg, which is not a party to the Inter–American Convention. The Court deferred ruling on the remainder of this motion until the close of defendants' case.

## C. Factual Background

Based upon the evidence presented at the trial, I find the following facts to be true. Since January 1, 1994, HCI has been in the business of exporting rum under the "Havana Club" trademark under an exclusive license from HCH. *See* Joint Statement of Stipulated Facts, Exhibit A to Joint Pretrial Order ("SF"), at ¶¶ 4–5. From 1994 through 1998, HCI sold approximately 38,400,000 bottles of Havana Club rum, with approximately 30% of the sales in Cuba and the remainder exported principally to Spain, France, Germany, Italy, Canada, Mexico, Bolivia and Panama. *See* Testimony of Noel Adrian, Managing Director of HCI ("Adrian Tr."), at 73–74.

Pursuant to the Cuban embargo that has been in place since 1963, U.S. law prohibits the importation of Cuban-origin products into the United States. *See generally, Havana Club*, 961 F.Supp. at 499–500. Thus, plaintiffs' Havana Club rum has never been sold in the United States. *See* Adrian Tr. at 105. U.S. visitors to Cuba, however, are permitted to bring the rum back to the United States as accompanying baggage. *See* Plaintiffs' Exhibit ("PX") 407. Pursuant to the travel restrictions imposed by the Office of Foreign Assets Control ("OFAC"), the class of travelers permitted to visit Cuba includes journalists, official government travelers, members of international organizations, persons with close relatives in Cuba and travelers who have received special licenses from OFAC. *See id.;* 31 C.F.R. § 515.560. These travelers may reenter the United States with up to $100 in Cuban-origin goods for personal use, with cigars and Havana Club rum being the most popular items brought back. *See id.;* Testimony of Hilda Maria Diaz ("Diaz Tr."), travel agent, at 299–300. Commencing in 1994, HCI has distributed a carrying case in which tourists can carry their purchases of Havana Club rum, and since that time travelers from the United States have been returning with Havana Club rum in these cases. *See* Adrian Tr. at 111–113; PX 150; Diaz Tr. at 293.

Although it is currently prohibited from selling in the United States, HCI intends to export Cuban-origin rum to the United States as soon as it is legally able. *See* Adrian Tr. at 105–07. HCI anticipates using the same marketing strategy it is currently following worldwide, which emphasizes the quality and the character of Havana Club rum based mainly upon its Cuban origin. *See id.* Thus, for example, the label on its Havana Club bottles reproduces the city of Havana and proclaims the product to be "El Ron de Cuba" ("The Rum of Cuba"). HCI's advertising similarly stresses the product's link to Cuba. *See* Adrian Tr. at 89–91.

The original producer of Cuban rum under the trademark "Havana Club" was Jose Arechabala, S.A. ("JASA"), a Cuban corporation, which was principally owned by members of the Arechabala family. *See* Testimony of Ramon Arechabala ("R.

**2.** Defendants have also asserted a counterclaim against plaintiffs, which they explained during closing statements as being limited to seeking "an injunction against ... plaintiffs [from] interfering with Bacardi's use of the Havana Club mark in the United States." Defendants suggested that plaintiffs were interfering with defendants' "distributorship relations." *See* Tr. at 1798. Defendants produced no evidence at trial of this alleged interference, and failed even to adequately explain the grounds for or nature of the relief sought. As a result, this counterclaim is dismissed.

Arechabala Tr.") at 1229, 1235; Defendants' Exhibit ("DX") 583. JASA exported Havana Club rum to the United States until 1960. *See* SF at ¶ 62. On or about January 1, 1960, however, armed forces from the Castro government forcibly entered into possession and confiscated the property and assets of JASA. *See* R. Arechabala Tr. at 1231–1243. On October 15, 1960, Cuban Law No. 890 ("Law No. 890") was issued, expropriating for the Cuban government the physical assets, property, accounts and business records of JASA. *See* DX 573A ("Law No 890") ("Nationalization is ordered by the forced expropriation of all industrial and commercial corporations, as well as the factories, stores, warehouses and other assets and rights of same and the properties of the following natural persons or companies").[3] No compensation was ever paid to JASA or its owners by the Cuban government or any other entity on behalf of the Cuban government for the property and assets that were seized in 1960. *See* R. Arechabla Tr. at 1236; Deposition of Gloria Marquez Arechabala Misto at 174–176.

From 1972 until some time in 1993, Empresa Cubana Exportadora De Alimentos y Productos Varios ("Cubaexport"), a Cuban state foreign trade enterprise established by the Cuban Ministry of Foreign Commerce, was the exclusive exporter of Havana Club rum, primarily to the Soviet Union and Eastern Europe. *See* SF at ¶¶ 64–66. In 1993, Cubaexport reorganized its business to incorporate a foreign partner, transferring all of the assets associated with the Havana Club rum business, including its Havana Club trademark, to HRL. Pursuant to the Convenio Asociativo entered into with Pernod Ricard, HRL transferred these assets to HCH, which, in turn, granted an exclusive license to sell Havana Club rum and use the Havana Club trademark to HCI.

Sometime in 1993, either prior to Pernod Ricard's entering into the Convenio or soon thereafter, a legal advisor to the company, Emilio Cuatrecasas, met with members of the Arechabala family to discuss purchasing their waiver of any claims to the Havana Club name that they may have had. *See* SF at ¶ 77; Testimony of Thierry Jacquillat, president of Pernod Ricard ("Jacquillat Tr.") at 1450–1452. Ultimately, no agreement was reached between the Arechabalas and Pernod Ricard. *See* Jacquillart Tr. at 1452.

The Arechabalas subsequently attempted to reach an agreement with International Distillers & Vintners Limited ("IDV"), an international distilled spirits company, with respect to Havana Club rum, but IDV advised the Arechabalas in or about March 1995 that it did not wish to enter into any such agreement. *See* SF at ¶ 80. The Arechabalas, however, found a willing partner in Bacardi & Co., and following negotiations beginning in or about 1995, the parties entered into a formal Share Purchase Agreement in April 1997. *See* PX 253, 254. Pursuant to this agreement, Bacardi & Co. purchased whatever rights (if any) the Arechabalas possessed in any Havana Club trademark, the related goodwill of the business and any rum business assets that the Arechabalas still owned. *See id.*

In 1995, Bacardi–Martini began to distribute rum in the United States which was produced in the Bahamas under the authority of Galleon, Bacardi & Co.'s predeccessor-in-interest, bearing the trademark Havana Club. This distribution consisted of sixteen cases of rum shipped to

---

**3.** The introduction to Law No. 890 states, in part, that "Whereas: The creative work of the Revolution, in its multiple aspects is based fundamentally on the full economic development of the Nation. Whereas: It is evident that this growth cannot be attained, unless by planning the economy, and the increase and progressive streamlining of production and the national control of the basic industries of the country. Whereas: Many of the large private corporations operating in the country are far from assuming the conduct that agrees with the objectives and goals of the revolutionary transformation of the national economy …"

four U.S. distributors. *See* SF at ¶ 19; PX 146. From May 1996 through August 1996, Bacardi distributed an additional 906 cases of Havana Club rum to distributors in seven states. *See* PX 136, 146. Bacardi has not distributed any Havana Club rum since 1996, pursuant to an agreement reached with plaintiffs to halt such sales pending the outcome of this litigation.

## II. Discussion

### A. Trade Name Claims

On October 21, 1998, prior to the trial but well into the course of this litigation, Congress passed § 211 of the Omnibus Appropriations Act. *See* Pub.Law 105–277 (1998). This new statute limits the registration and renewal of, and the assertion of trademark and trade name rights in, marks that were used in connection with property confiscated by the Cuban government. The statute provides:

> (a)(1) Notwithstanding any other provision of law, no transaction or payment shall be authorized or approved pursuant to section 515.527 of title 31, Code of Federal Regulations,[4] as in effect on September 9, 1998, with respect to a mark, trade name, or commercial name that is the same or substantially similar to a mark, trade name, or commercial name that was used in connection with a business or assets that were confiscated unless the original owner of the mark, trade name or commercial name, or the bona fide successor-in-interest has expressly consented.
>
> (2) No U.S. court shall recognize, enforce or otherwise validate any assertion of rights by a designated national based on common law rights or registration obtained under such section 515.527 of

such a confiscated mark, trade name or commercial name.

> (b) No U.S. court shall recognize, enforce or otherwise validate any assertion of treaty rights by a designated national or its successor-in-interest under sections 44(b) or (e) of the Trademark Act of 1946 (15 U.S.C. § 1126(b) or (e)) for a mark, trade name or commercial name that is the same or substantially similar to a mark, trade name, or commercial name that was used in connection with a business or assets that were confiscated unless the original owner of such mark, trade name, or commercial name, or the bona fide successor-in-interest has expressly consented.[5]

Defendants argue that subsection (b) of this new statute prevents this Court from recognizing any trade name rights to which plaintiffs would otherwise be entitled in the name "Havana Club." It is well-established that Congress may pass legislation that effectively takes away rights to which parties were previously entitled by virtue of U.S. treaty obligations. "[A]n Act of Congress ... is on a full parity with a treaty, and ... when a statute which is subsequent in time is inconsistent with a treaty, the statute to the extent of the conflict renders the treaty null." *Reid v. Covert,* 354 U.S. 1, 18, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957); *Whitney v. Robertson,* 124 U.S. 190, 193, 8 S.Ct. 456, 31 L.Ed. 386 (1888) (where a treaty and a statute conflict, the last one in date controls); *accord, Breard v. Greene,* 523 U.S. 371, 118 S.Ct. 1352, 1355, 140 L.Ed.2d 529 (1998). Courts, however, will find later legislation to have abrogated a treaty only when Congress' intention to do so "has been clearly expressed." *Trans World Airlines, Inc. v. Franklin Mint Corp.,* 466 U.S. 243, 252, 104 S.Ct. 1776, 80

**4.** The Cuban Asset Control Regulations ("CACR"), 31 C.F.R. Part 515, regulate the U.S. embargo against Cuba. *See Havana Club Holding v. Galleon,* 961 F.Supp. at 499–501. Section 515.527, in particular, authorizes transactions related to the registration and renewal of patents, trademarks and copy-

rights by Cuban nationals in the United States Patent and Trademark Office and the United States Copyright Office.

**5.** There is no official legislative history surrounding the enactment of § 211.

L.Ed.2d 273 (1984). Abrogation of a treaty by implication will only be found when the later legislation is "in irreconcilable conflict" or the legislation "covers the whole subject of the earlier [treaty], and is clearly intended as a substitute." *Posadas v. National City Bank of New York*, 296 U.S. 497, 503, 56 S.Ct. 349, 80 L.Ed. 351 (1936). In either case, the intention of the legislature must be clear. *See id.*

Here, in specifying that "no U.S. court shall recognize, enforce or otherwise validate any assertion of treaty rights by a designated national," Congress made clear its intention to repeal rights in marks and trade names derived from treaties where those marks and trade names satisfy the requirements set forth in § 211. As a company owned in part by the Cuban government, HCI clearly is a "designated national" within the meaning of the statute.[6] *See* SF at ¶ 41. In addition, the evidence at trial established that on October 13, 1960, the Revolutionary Cuban Regime confiscated the physical assets, property and business records of JASA, the original owner of the Havana Club trademark. *See* 31 C.F.R. § 516.336. Thus, on its face, § 211 would appear to prevent HCI from asserting its trade name claims. HCI, however, argues that for a variety of reasons § 211 does not effect the outcome in this case.

### 1. *Claim Asserted under the Inter–American Convention*

HCI's first argument turns on the language of § 211(b) and the self-executing nature of the Inter–American Convention. Specifically, HCI argues that § 211 does not apply to rights derived from self-executing treaties, but rather is only addressed to the assertion of "treaty rights ... *under* Sections 44(b) or (e) of the Trademark Act" (emphasis added). HCI points out that it has asserted a trade name infringement claim directly under Chapter III of the Inter–American Convention, and that the Convention grants it the private right to bring an action in the United States to enjoin infringement of its trade name. Thus, HCI argues, because it has pled a claim for protection of its trade name under Chapter III of the Inter–American Convention, and because this claim does not arise "under sections 44(b) or (e) of the Trademark Act," § 211 does not bar this claim.

■ The Inter–American Convention, which was adopted at a special conference held in February 1929, is a self-executing treaty, and thus it became law in the United States without the necessity for implementing legislation. *See Bacardi Corp. of America v. Domenech*, 311 U.S. 150, 161, 61 S.Ct. 219, 85 L.Ed. 98 (1940). Article III, which covers commercial or trade names, provides that a party in any of the Contracting States

> may, in accordance with the law and procedure of the country where the proceeding is brought, apply for and obtain an injunction against the use of any commercial name or the cancellation of the registration or deposit of any trade mark ... by proving: (a) that the commercial name or trade mark, the enjoining or cancellation of which is desired, is identical with or deceptively similar to his commercial name already legally adopted and previously used in any of the Contracting States, in the manufacture, sale or production of articles of the same class ...

General Inter–American Convention for Trademark and Commercial Protection, Chapter III, Article 18.

In 1946, with the passage of the Lanham Act, Congress attempted to correct what it perceived as the failure of the United States to carry out its treaty commitments to secure intellectual property rights. *See* S.Rep. No. 1333, 79th Cong., 2d Sess. 5 (1946) at 1276 ("There has been no serious attempt fully to secure to nationals of countries signatory to the conventions

---

6. Section 211 incorporates the definitions of "designated national" and "confiscated" set forth at 31 C.F.R. §§ 515.305 and 515.336, respectively.

their trade-mark rights in this country and to protect them against the wrongs for which protection has been guaranteed by the conventions.... To remedy this discreditable situation is merely an act of international good faith"). Section 44(b) of the Act provides that foreigners are to be entitled to the same trademark and trade name rights, and the same right to be free from unfair competition, to which U.S. citizens are entitled. *See* 15 U.S.C. § 1125(b) ("[a]ny person whose country of origin is a party to a convention or treaty relating to trademarks, trade or commercial names, or the repression of unfair competition, to which the United States is also a party ... shall be entitled to the benefits of this section under the conditions expressed herein to the extent necessary to give effect to any provision of such convention ...")[7]. To the extent that the United States was a party to any convention or treaty relating to trademarks or trade names that was not self-executing, the Lanham Act served as the implementing legislation.

■ HCI argues that because the Inter–American Convention is self-executing, and because it gives private parties the right to sue for an injunction against an infringer, a claim brought pursuant to the Convention is not brought "under" § 44 of the Lanham Act and is thus not effected by § 211. This argument, however, strains the language of § 211 and would lead to an illogical result. Section 211 explicitly states that no court shall recognize "treaty" rights of designated nationals. The further reference in that section to § 44(b) of the Lanham Act should not be read to distinguish certain treaties from others. Both the text of § 44(b) and its legislative history indicate that the purpose of this section was to execute *all* U.S. treaty obligations respecting trademarks and trade names. *See* 15 U.S.C. § 1127. ("[t]he intent of this chapter is to ...

provide rights and remedies stipulated by treaties and conventions respecting trademarks, trade names, and unfair competition entered into between the United States and foreign nations"); S.Rep. No. 1333, 79th Cong., 2d Sess. 5 (1946) (stating that purpose of Lanham Act was "to carry out by statute our international commitments to the end that American traders in foreign countries may secure the protection to their marks to which they are entitled").

Section 44(b) when passed by Congress applied—and still today applies—to persons from a country that is a party to *any* convention or treaty relating to trademarks and trade names, and·the act provided the framework for the assertion of all trademark and trade name treaty rights. Although the Lanham Act may have served formally as the implementing legislation for those treaties that were not self-executing, there is no principled or logical reason for finding that § 211 abrogates rights derived from those treaties that required statutory implementation but does not have the same effect on treaties that were self-executing.

Thus, although plaintiffs have asserted a trade name claim under the Inter–American Convention, § 44 was intended to implement the rights and remedies of the Convention and provided the framework through which those rights were asserted. *See also* Inter–American Convention, Chap. III, Art. 18 (emphasis added) ("[a]ny manufacturer, industrialist, merchant or agriculturist domiciled or established in any of the Contracting States may, *in accordance with the law and procedure of the country where the proceeding is brought*, apply for and obtain an injunction against the use of" a deceptively similar trade name or trademark). The reference in § 211 to § 44 thus does not lead to the conclusion that Congress intended to

**7.** As originally enacted, § 44(b) specifically referenced the International Convention for the Protection of Industrial Property (Paris Union), the Inter–American Convention and

"any other convention or treaty relating to trade-marks, trade or commercial names, or the repression of unfair competition to which the United States is a party."

abrogate "treaty" rights asserted "under" the Lanham Act, and not those asserted "under" the Inter–American Convention.

■ Because § 211 requires that HCI obtain the consent of the original owners of the Havana Club business, and because they do not have this consent, § 211 prevents HCI from asserting its claims for trade name infringement. Section 211, however, does not prevent HCI from asserting its false designation of origin claim. This claim does not arise out of any ownership rights that HCI is asserting in the Havana Club name confiscated by the Cuban government. Rather, it arises out of HCI's claim that as a producer of Cuban rum, it is likely to be damaged by defendants' allegedly false designation of Cuban origin on its product. Because § 211 does not explicitly abrogate rights to bring an unfair competition claim, this Court will not extend its reach to such claims.

### 2. *Abandonment*

■ HCI argues that § 211 does not require the abrogation of treaty rights in circumstances where the original owner of the trademark or trade name has abandoned its rights in that mark. According to HCI, its right to the "Havana Club" trade name arises out of its adoption and use of the name beginning in 1994, and that well prior to this time, Jose Arechabala, S.A. had abandoned any rights it had in the name.

HCI's argument, however, is not supported by the language of § 211. The statute states that a designated national cannot assert rights in a mark that is the same or substantially similar to one that was "used in connection with a [confiscated] business," a requirement that is clearly met here. The statute does not require continuous use or provide a defense of abandonment.

### 3. *Retroactivity*

■ HCI argues that § 211 cannot be applied to this case because such application would retroactively impair trade name

rights possessed by HCI prior to its enactment. "When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach." *Landgraf v. USI Film Products,* 511 U.S. 244, 280, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). The language of § 211 is silent as to its application to cases pending prior to its enactment.

The analysis, however, does not end here. In the absence of express language as to the statute's reach, a court

> must determine whether the new statute would have retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

*Id.* This presumption against retroactivity is rooted in considerations of fairness and reasonable reliance and the principle that individuals should be able to conform their conduct to the law. *Id.* at 265, 269, 114 S.Ct. 1483.

■ In certain situations, however, application of a statute passed after the events at issue may not have an impermissibly retroactive effect. "When the intervening statute authorizes or affects the propriety of prospective relief, application of the new provision is not retroactive." *Id.* at 273, 114 S.Ct. 1483; *see also American Steel Foundries v. Tri–City Central Trades Council,* 257 U.S. 184, 201, 42 S.Ct. 72, 66 L.Ed. 189 (1921) ("relief by injunction operates in futuro"). As Justice Scalia explained in his concurrence in *Landgraf,* "[c]ourts traditionally withhold requested injunctions that are not authorized by then-current law, even if they were authorized at the time suit commenced and at the time the primary conduct sought to be enjoined was first

engaged in … Since the purpose of prospective relief is to affect the future rather than remedy the past, the relevant time for judging its retroactivity is the very moment at which it is ordered." 511 U.S. 244, 293, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994); *Viacom Inc. v. Ingram Enterprises, Inc.*, 141 F.3d 886, 888–890 (8th Cir.1998) (application of Federal Trademark Dilution Act to use of trademark that began before passage of act does not render statute impermissibly retroactive). Thus, because HCI seeks only future injunctive relief, application of § 211 would not have an impermissibly retroactive effect.

Moreover, such application would not unfairly upset HCI's settled expectations or unfairly impair its investment. At the time that HCI began its business in 1994 and to this day, it has been aware that the embargo prevents it from selling rum in the United States. HCI built up its business based upon sales in other countries, not upon any sales or reputation that it has developed in the United States.

#### 4. *Separation of Powers*

■ HCI also argues that § 211 violates the separation of powers doctrine because it represents an attempt by Congress to dictate how this Court must rule in this case. Under our tripartite system of government, the role of Congress is to enact laws of general applicability, and it is for the courts to apply those laws in determining the outcome of particular cases. Legislation violates the separation of powers doctrine when it "prescribes a rule of decision for courts to follow without permitting courts to exercise their judicial powers independently." *Benjamin v. Jacobson*, 124 F.3d 162, 173 (2d Cir.1997), *vacated on reh'g en banc*, 172 F.3d 144, 1999 WL 188240 (2d Cir. March 23, 1999) (citing *United States v. Klein*, 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1871)); *see also* *Axel Johnson, Inc. v. Arthur Andersen & Co.*, 6 F.3d 78, 81 (2d Cir.1993) ( "[t]he rule of *Klein* precludes Congress from usurping the adjudicative function assigned to the federal courts under Article III").

■ Although the rule of *Klein* prohibits Congress from directing particular results in individual cases, it does not prevent Congress from "changing the law applicable to pending cases." *Axel Johnson*, 6 F.3d at 81. Where "legislation can be characterized as changing the underlying law rather than as prescribing a different outcome under the pre-existing law, it will not violate the separation of powers principle formulated in *Klein*." *Benjamin*, 124 F.3d at 174; *Robertson v. Seattle Audubon Society*, 503 U.S. 429, 112 S.Ct. 1407, 118 L.Ed.2d 73 (1992). Moreover, the fact that the change in the law effects only a "limited class of cases" does not compel the conclusion that it violates separation of powers. *See Axel*, 6 F.3d at 82; *Robertson*, 503 U.S. at 435 n. 2, 112 S.Ct. 1407 (upholding statute that specifically mentioned two pending cases to which it was applicable).

■ As in *Robertson*, § 211 effected a change in the underlying law applicable to this case. The statute establishes that Cuban nationals cannot assert treaty rights in trademarks and trade names if such names or marks previously were used in connection with confiscated businesses. The statute does not, however, "purport[ ] to direct any particular findings of fact or applications of law, old or new, to fact." *Robertson*, 503 U.S. at 438, 112 S.Ct. 1407; *Axel*, 6 F.3d at 82 (finding that statute did "not directly interfere with judicial fact-finding"). This Court must still determine whether the facts of this case satisfy the statutory requirements, namely whether the statute applies to plaintiffs and whether the name at issue was used in connection with a confiscated business.[8]

---

8. HCI's final argument, that in order for § 211 to apply defendants would have to show that JASA had a positive net value when it was expropriated, is not convincing.

Section 211 defines "confiscated" as the expropriation of the ownership of property "without the property having been returned or adequate and effective compensation being

## II. False Designation of Origin Claim—Standing

Plaintiffs have also brought a claim that Bacardi's use of the "Havana Club" trademark and the label used on the rum—which feature an old-style sketch of Malecon, a seafront boulevard in Havana—constitute a false designation of geographic origin in violation of § 43(a) of the Lanham Act. Plaintiffs argue that this trademark and labelling will deceive customers into believing that the rum is of Cuban origin when, in fact, it is produced in the Bahamas.

Section 43(a) provides that

"[a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services or commercial activities by another person ... shall be liable in a civil action *by any person who believes that he or she is likely to be damaged by such act.*"

15 U.S.C. § 1125 (emphasis added). Defendants assert that plaintiffs lack standing to press their § 43(a) claim because they cannot satisfy the statute's requirement that they are "likely to be damaged" by any of defendants' actions. The thrust of their argument is that because the CACR prevent plaintiffs from selling any rum in the United States, plaintiffs cannot demonstrate any likely injury resulting from defendants' actions.

Standing is comprised of constitutional and prudential components.[9] *See Bennett v. Spear,* 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (citing *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). The constitutional component is derived from Article II's requirement of a "case or controversy." It requires that a plaintiff have suffered an "injury in fact," that this injury be "fairly traceable" to the actions of the defendant and that a favorable decision be able to redress this injury. *Bennett,* 520 U.S. at 162, 117 S.Ct. 1154.

Although consumers lack standing to assert § 43(a) claims, persons or entities that will suffer a commercial injury as a result of defendant's actions generally have standing. *See Berni v. International Gourmet Restaurants,* 838 F.2d 642, 648 (2d Cir.1988) ("this court has limited standing to assert a section 43 claim to a 'purely commercial class' of plaintiffs"). Although consumers do not have standing, consumer confusion is at the heart of the purpose of the Lanham Act and is "the central inquiry in all cases of alleged trademark infringement and unfair competition." *Springs Mills, Inc. v. Ultracashmere House, Ltd.,* 724 F.2d 352, 357 (2d Cir.1983).

In the context of claims under § 43(a), the Second Circuit has further refined the concept of standing. A plaintiff need not be a direct competitor of the party allegedly engaging in the false designation of its products. *See id.* To establish standing, however, a plaintiff must demonstrate a "reasonable interest to be protected" against the advertiser's false or misleading claims, and a "reasonable basis" for believing that this interest is likely to be damaged by the false or misleading advertising. The "reason-

provided." The record shows that all of JASA's assets were taken and that it received no compensation.

**9.** The prudential component of standing is comprised of "judicially self-imposed limits

on the exercise of federal jurisdiction." *Bennett,* 520 U.S. at 162, 117 S.Ct. 1154. Unlike standing requirements derived from the Constitution, they may be abrogated or modified by Congress. *See id.*

able basis" prong embodies a requirement that the plaintiff show both likely injury and a causal connection to the false advertising.

*PDK Labs, Inc. v. Friedlander,* 103 F.3d 1105, 1111 (2d Cir.1997) (citing *Ortho Pharmaceutical Corp. v. Cosprophar, Inc.,* 32 F.3d 690, 694 (2d Cir.1994) (internal citations omitted)). This standard requires more than a "mere subjective belief" of injury, but does not require plaintiff to prove that it has suffered actual monetary loss. *Johnson & Johnson v. Carter–Wallace, Inc.,* 631 F.2d 186, 189 (2d Cir.1980). Therefore, a plaintiff who can demonstrate that it has the "potential for a commercial or competitive injury," *Berni,* 838 F.2d at 648, or, in other words, that the false designation of defendant's product is likely to cause plaintiff to suffer a loss in sales, has standing to bring a suit for injunctive relief. *Johnson & Johnson,* 631 F.2d at 190.

Where plaintiff's and defendant's products are not directly in competition, courts in this circuit have held that plaintiff's likelihood of injury and causation will not be presumed but must be demonstrated in some manner. *See Ortho Pharmaceutical,* 32 F.3d at 694. This link is generally provided by the introduction of consumer surveys showing that a significant number of consumers are being misled by defendant's falsehoods. *See Johnson & Johnson,* 631 F.2d at 190–191.

 Plaintiffs do not dispute that due to the particular circumstances of this case—namely that they are prevented from importing their rum into this country because of the embargo—their product does not, and cannot, currently compete with defendant's Havana Club rum in the United States and that they therefore have not lost any sales here. Nor have they

argued (or proved) that their rum competes with defendants' Havana Club product anywhere outside of the United States.[10] Plaintiffs, however, present a variety of arguments why they nonetheless have standing to challenge defendants' alleged false designation of origin.

Plaintiffs argue that they have standing to bring a § 43(a) claim "simply by virtue of their position as Cuban-based exporters of Cuban-origin rum." Because plaintiffs market their rum on the basis of it being the exclusive or primary source of Cuban-origin rum, plaintiffs argue that sales of "false" Cuban rum will deprive them of their main selling point and cause them to lose consumers looking for Cuban-origin rum. In addition, as a related argument, plaintiffs argue that Bacardi's packaging will lead consumers to identify the "character and quality" of Bacardi's rum with Cuban-origin rum, which could hurt plaintiffs' reputation for quality.

Plaintiffs also argue that the embargo is a "temporary suspension" of their ability to sell rum in the United States and that they are poised to enter this market—a natural area of expansion for a Cuban-rum producer—as soon as the embargo is lifted. This fixed intent to enter the U.S. market as soon as the law allows, they argue, is a "contemplated commercial interest" sufficient to confer standing on them. *See PDK Labs,* 103 F.3d at 1111.

In addition, plaintiffs contend that they are losing sales to U.S. visitors to Cuba. As discussed above, certain Americans are authorized to visit Cuba and to spend up to $100 per day during their stay, and plaintiffs have presented evidence that a significant number of these Cuban visitors buy their Havana Club rum while in Cuba. If defendants' Havana Club rum is sold in the United States, they contend, these visitors will believe that Cuban rum is avail-

---

**10.** The Lanham Act can reach activities occurring outside the United States. In determining when the extraterritorial application of the Act is proper, a court must look to the following factors: (1) whether defendant's conduct has a "substantial effect on United States commerce"; (2) whether defendant is a United States citizen; and (3) whether there is a conflict with trademark rights established under foreign law. *See Fun–Damental Too, Ltd. v. Gemmy Industries, Corp.,* 111 F.3d 993, 1006 (2d Cir.1997).

able in this country, and they will be less likely to buy plaintiffs' rum while in Cuba.

### 1. *Plaintiffs' status as Cuban-origin rum producers*

■■ In support of their first argument, plaintiffs point to the language of § 43(a) as it existed prior to the 1988 amendments to the Lanham Act. This prior version of § 43(a) granted standing to

> any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or ... any person who believes that he or she is likely to be damaged by the use of any such false description.

15 U.S.C.A. § 1125(a) (prior to amendment). The Senate Report on the 1988 amendments states that by changing the language regarding standing, the Senate's intention was that standing "should continue to be decided on a case-by-case basis, and that the amendments ... made to the legislation with respect to [this issue] should not be regarded as either limiting or extending applicable decisional law." Sen.Rep. No. 100–515, 100th Cong., 2d Sess. (1988) at 5604.

Because the Cuban embargo presents a unique factual circumstance, however, there is no prior "applicable decisional law" upon which this Court can rely. Plaintiffs have not identified—and this Court has not found—any § 43(a) case prior to 1988 in which a court upheld standing on the sole basis that the plaintiff was from the locality falsely designated as the origin of defendant's product. Plaintiffs point to *Scotch Whiskey Ass'n v. Barton Distilling Co.*, 489 F.2d 809 (7th Cir.1973) in support of their argument. In that case, the court granted an injunction sought by plaintiffs, "producers of Scotch whiskey in Scotland, marketed throughout much of the world" against an American defendant that shipped "Scotch Whiskey" labels to Panama and the Canal Zone to be used on non-Scottish whiskey. There is nothing in that court's opinion, however, indicating that plaintiffs were not selling Scotch Whiskey in Panama and the Canal

Zone. Indeed, it is reasonable to presume that plaintiffs were in direct competition with defendants in those areas. Similarly, in the other cases cited by plaintiffs, the falsely designated products were sold in the same area as the plaintiff's products, and no court found standing based solely on the fact that the plaintiff did business in the area falsely designated by the defendant. *See Black Hills Jewelry Manufacturing Co. v. Gold Rush, Inc.*, 633 F.2d 746 (8th Cir.1980) (falsely designated Black Hills jewelry sold in South Dakota); *Scotch Whiskey Assoc. v. Consolidated Distilled Products, Inc.*, 210 U.S.P.Q. 639 (N.D.Ill.1981) (spurious Scottish whiskey sold in United States).

### 2. *Plaintiffs' intent to enter the United States*

Plaintiffs put great emphasis on their fixed intention to enter the U.S. market as soon as they are legally able. This intent appears to be genuine, and the only obstacle to plaintiffs' entering the U.S. market is the embargo. *See* Adrian Tr. at 133–34. Obviously, following such entry, plaintiffs would be direct competitors of defendants in the rum market.

■■ A party can base standing on a potential for a future competitive injury. *See Berni*, 838 F.2d at 648 (plaintiff must show "the potential for a commercial or competitive injury"); *National Lampoon, Inc. v. American Broadcasting Cos., Inc.*, 376 F.Supp. 733, 746 (S.D.N.Y.1974), *aff'd*, 497 F.2d 1343 (2d Cir.1974) (satirical humor magazine had standing to sue television network for using portion of its name where magazine was negotiating for production of its own special program and "[n]etwork television [was] within plaintiff's area of natural expansion"). It is clear, however, that such future injury may not be too remote.

So, for example, in *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105 (2d Cir.1997), a weight loss products retailer brought a declaratory judgment action against the holder of a patent on a method for produc-

ing weight loss, seeking a declaration that the patentee lacked standing to bring false advertising claims against it under § 43(a). The Court held that because the patentee lacked a product that competed with plaintiff, it had no standing: "[patentee's] hopes of eventually obtaining FDA approval and selling a retail weight loss product are too remote at this stage to confer standing to challenge [plaintiff's] advertising." *Id.* at 1112. In so holding, the court expressed doubt as to whether the patentee could ever develop such product, given the large expenses it would first have to incur in studies, legal expenses and product testing. *See id.* at 1112 n. 7; *see also Ortho Pharmaceutical,* 32 F.3d at 696–97 (no standing for a manufacturer of RETIN–A prescription drugs to sue distributor of over-the-counter anti-aging cosmetics because the products are not in direct competition and plaintiff failed to provide any evidence that consumers would see defendant's products as substitute for plaintiff's).

■ Plaintiffs' ability to enter the U.S. market is too remote at this point to confer standing. The embargo is, admittedly, designed to be temporary. Despite widespread criticisms of the embargo, however, *see Havana Club,* 961 F.Supp. at 498–502, it has now been in place for over thirty-five years. In addition, the recent passage of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996 ("Cuban Liberty Act"), 22 U.S.C. §§ 6021–6091, which codifies and strengthens the embargo, attests to its continued viability for the foreseeable future. Under the LIBERTAD Act, the President, upon consultation with Congress, may "take steps to remove the economic embargo of Cuba when the President determines that a transition to a democratic elected government in Cuba has begun." 22 U.S.C. § 6061(14). The conditions constituting this transition are substantial and include, for example, the legalization of all political activity, 22 U.S.C. § 6065(a)(1), the release of all political prisoners, 22 U.S.C. § 6066(a)(2), and

a public commitment to the organization of free and fair elections for a new government, 22 U.S.C. § 6065(a)(4).

The issue is one of remoteness. Before plaintiffs can sell rum in this country, significant changes must first occur in the political situation in Cuba, in addition to executive and legislative action in this country. Unlike in *PDK,* in which the only significant obstacle to the patentee's developing a competing product was its raising sufficient funds, an act presumably almost entirely within its control, the conditions precedent to the lifting of the embargo are beyond the control of plaintiffs and so are in a very real sense even more remote. There is no way for this Court to reasonably foresee when these changes will occur, whether in the near future or in another 35 years. At this point, because plaintiffs can sell no product in this country and may not be so able for a significant length of time, they suffer no impairment of their ability to compete as a result of defendants' actions. Any competitive injury plaintiffs will suffer based upon their intent to enter the U.S. market once the embargo is lifted is simply too remote and uncertain to provide them with standing.

3. *Present injury to plaintiffs' sales and reputation*

■ Plaintiffs also argue that defendants' false designation of Cuban origin on their rum will impair plaintiffs' sales to United States visitors to Cuba. At closing arguments, plaintiffs argued that if consumers purchased defendants' rum in the United States under the false belief that Cuban Havana Club rum is available here, such consumers would be less likely to buy plaintiffs' rum when visiting Cuba. In support of this argument, plaintiffs offered evidence that their product is purchased in Cuba by U.S. visitors and brought into the United States by a large percentage of them as accompanying baggage. *See* Diaz Test. at 293–302.

Plaintiffs' argument, however, suffers from one fatal flaw. The class of U.S. citizens permitted to travel to Cuba is very

limited, including those with relatives in Cuba, journalists and students. Those travelers authorized to visit Cuba, who must comply with OFAC travel restrictions, are certainly aware of the embargo and the fact that Cuban products are not available in the United States. Thus, it seems highly unlikely that those travelers seeking genuine Cuban rum would be deterred by sales of defendants' rum in the United States.[11]

Plaintiffs provide no further explanation of how their reputation and sales are damaged by defendants' alleged false designation of origin. With no ability to sell rum in the United States in the foreseeable future and no reasonable expectation that U.S. travelers to Cuba, aware of the embargo against Cuban-origin goods in this country, will think that defendants' rum is made in Cuba, there is no other basis for a showing of a foreseeable injury.[12]

The fact that plaintiffs have no standing to bring this claim, however, does not automatically mean that defendants' alleged false designation of origin—if true—will go unremedied. Bacardi faces direct competition from other rum producers in this country, who, if able to show reliance by consumers on such designation and their own consequent loss of sales, are likely to have standing to seek redress. There is no doubt that plaintiffs seek a laudable capitalist goal—to compete fairly, to maximize their sales and perhaps even to protect American consumers. Their inability to do so at this time, however, is not caused by defendants' actions, however fair or unfair they may be, but by the executive and legislative determination that the Cuban embargo continues to be a component of our foreign policy.

### IV. Conclusion

For the reasons set forth above, this Court finds for defendants on all of plaintiffs' claims. A judgment in defendants' favor shall be entered immediately.

SO ORDERED.

---

11. Plaintiffs have presented evidence based on consumer surveys that despite the embargo, 33% of Americans think that it is legal to sell rum from Cuba in the United States and 9% do not know whether it is legal or illegal. Despite this evidence, it is intuitively doubtful that these finding would apply to U.S. travelers authorized to visit Cuba.

12. Because HCI has no standing to bring this claim, there is no need to address defendants' "unclean hands" defense.