203 F.3d 116 (2nd Cir. 2000)
 HAVANA CLUB HOLDING, S.A., HAVANA CLUB INTERNATIONAL, S.A., Plaintiffs- Counter-Defendants-Appellants,
v.
GALLEON S.A., BACARDI-MARTINI USA, INC., Defendants-Counter-Claimants-Appellees,
GALLO WINE DISTRIBUTORS, INC., G.W.D. HOLDINGS INC., PREMIER WINE AND SPIRITS, Defendants-Appellees.
 Docket No. 99-7582
August Term 1999
 UNITED STATES COURT OF APPEALS
SECOND CIRCUIT
 Argued: Oct. 13, 1999
Decided: Feb. 4, 2000
 
 Appeal from the June 28, 1999, judgment of the United States District Court for the Southern District of New York (Shira A. Scheindlin, District Judge), dismissing, after a bench trial, Lanham Act claims for trademark and trade name infringement and for false advertising. The District Court held the infringement claims barred by statutory and regulatory provisions of the Cuban embargo and rejected the false advertising claim for lack of standing, related to the embargo.
 Affirmed.[Copyrighted Material Omitted][Copyrighted Material Omitted]
 Charles S. Sims, New York, N.Y. (Joshua J. Pollack, Jenifer Paine, Proskauer Rose LLP; Michael Krinsky, Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C., New York, N.Y., on the brief), for plaintiffs-appellants.
 William R. Golden, Jr., New York, N.Y. (Michelle M. Graham, Margaret Ferguson, Scott H. Mandel, Kelley Drye & Warren LLP, New York, N.Y., on the brief), for defendants-appellees.
 (Mark Traphagen, Brett G. Kappel, David C. Quam, Marinn F. Carlson, Powell, Goldstein, Frazer & Murphy, Washington, D.C., submitted a brief for amicus curiae Organization for International Investment).
 Before: WINTER, Chief Judge, NEWMAN, and SOTOMAYOR, Circuit Judges.
 JON O. NEWMAN, Circuit Judge:
 
 
 1
 This appeal, raising issues concerning the Cuban embargo, arises from a dispute between two rum producers over the rights to the "Havana Club" trademark and trade name. Havana Club Holding, S.A. ("HCH") and Havana Club International, S.A. ("HCI") appeal from the June 28, 1999, judgment of the United States District Court for the Southern District of New York (Shira A. Scheindlin, District Judge), dismissing trademark, trade name, and false advertising claims against Defendants-Appellees Bacardi & Company Ltd. and Bacardi-Martini USA, Inc. We conclude that the Cuban embargo barred assignment to HCH of the "Havana Club" trademark registered in the United States, that we are precluded by statute from enforcing whatever rights HCI might have to trade name protection under the General Inter-American Convention for Trade Mark and Commercial Protection, and that HCI lacks standing to assert its false advertising and unfair competition claims under the Lanham Act. We therefore affirm.
 
 Background
 
 2
 Plaintiff-Appellant HCI is a joint stock company organized under the laws of Cuba, with its domicile and principal place of business in Cuba. Plaintiff-Appellant HCH, a Luxembourg corporation, owns the "Havana Club" trademark in certain countries outside the United States. Defendant-Appellee Bacardi & Company is a corporation organized in Liechtenstein and headquartered in the Bahamas, and Defendant-Appellee Bacardi-Martini USA is a Delaware corporation (collectively "Bacardi"). Defendant Galleon S.A. has merged into Bacardi & Company.
 
 
 3
 Before the Cuban revolution, Jose Arechabala, S.A. ("JASA"), a Cuban corporation owned principally by members of the Arechabala family, produced "Havana Club" rum and owned the trademark "Havana Club" for use with its rum. JASA exported its rum to the United States until 1960, when the Cuban government, under the leadership of Fidel Castro, seized and expropriated JASA's assets. Neither JASA nor its owners ever received compensation for the seized assets from the Cuban government.
 
 
 4
 The Cuban embargo. In 1963, the United States imposed an embargo on Cuba, reflected in the Cuban Assets Control Regulations ("CACR"), as amended, 31 C.F.R. 515.101-515.901 (1999), promulgated pursuant to section 5(b) of the Trading with the Enemy Act of 1917, as amended, 12 U.S.C. 95a ("TWEA"). In 1996, Congress enacted the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act ("LIBERTAD Act"), Pub. L. No. 104-114, 110 Stat. 785 (1996), which, among other things, codified the regulations implementing the Cuban embargo, see22 U.S.C. 6032(h). The Secretary of the Treasury has the authority to administer the Cuban embargo, which he has delegated to the Office of Foreign Assets Control ("OFAC"), see31 C.F.R. 515.802.
 
 
 5
 The trademarks and their assignment. From 1972 to 1993, Empresa Cubana Exportadora De Alimentos y Productos Varios ("Cubaexport"), a Cuban state enterprise, exclusively exported "Havana Club" rum, primarily to Eastern Europe and the Soviet Union. Cubaexport registered the "Havana Club" trademark with Cuban authorities in 1974 under Registration No. 110,353, and with the United States Patent and Trademark Office ("USPTO") in 1976 under Registration No. 1,031,651. In 1993, Cubaexport sought to reorganize and find a foreign partner for its "Havana Club" rum business. Havana Rum & Liquors, S.A. ("HR&L"), a newly formed Cuban company, entered into a joint venture agreement with Pernod Ricard, S.A. ("Pernod"), a French company distributing liquor internationally. Under a November 1993 agreement between Pernod and HR&L, HCI and HCH were formed. In an agreement dated January 10, 1994, Cubaexport assigned trademark Registration No. 1,031,651, the United States registration for the "Havana Club" trademark, to HR&L, and in a subsequent agreement dated June 22, 1994, HR&L assigned this trademark to HCH. In 1996, HCH renewed the United States registration of the "Havana Club" mark for a term of ten years.
 
 
 6
 In April 1997, Bacardi & Co. purchased the Arechabala family's rights (if any) to the "Havana Club" trademark, the related goodwill of the business, and any rum business assets still owned by the Arechabala family.
 
 
 7
 OFAC's actions concerning the assignments. After an October 5, 1995, application to OFAC for a "specific" license authorizing the 1994 assignments of the "Havana Club" trademark from Cubaexport to HR&L, and from HR&L to HCH,[1] OFAC, on November 13, 1995, issued to Cubaexport License No. C-18147, which approved the two assignments and authorized all necessary transactions incident to the assignments of the mark.
 
 
 8
 However, on April 17, 1997, after the instant lawsuit was filed in the District Court, OFAC issued a Notice of Revocation, revoking License No. C-18147. The revocation notice stated:
 
 
 9
 You are notified that, as a result of facts and circumstances that have come to the attention of this Office which were not included in the application of October 5, 1995, License No. C-18147 . . . is hereby revoked retroactive to the date of issuance. The determination to revoke License No. C-18147 is made pursuant to 515.805 of the Cuban Assets Control Regulations, 31 C.F.R. Part 515. Any action taken under this specific license from the date of issuance until now is null and void as to matters under the jurisdiction of the Office of Foreign Assets Control.
 
 
 10
 The parties' sales of rum. Since 1994, HCI has exported rum under the "Havana Club" trademark under an exclusive license to that mark from HCH. From 1994 to 1998, HCI sold over 38 million bottles of "Havana Club" rum, with approximately 30 percent of the sales in Cuba--including sales to Americans traveling in Cuba--and the remainder exported principally to Spain, France, Germany, Italy, Canada, Mexico, Bolivia and Panama. Under travel regulations imposed by OFAC, the class of travelers permitted to visit Cuba may reenter the United States with up to $100 in Cuban-origin goods for personal use. Havana Club rum and cigars are the most popular items brought back.
 
 
 11
 Because of the Cuban embargo, however, HCI's "Havana Club" rum has never been sold in the United States. HCI intends to export its rum to the United States as soon as legally possible. HCI anticipates using its current marketing strategy of emphasizing the quality and character of its rum based primarily upon its Cuban origin. The label on HCI's "Havana Club" rum portrays the city of Havana and contains the phrase "El Ron de Cuba" ("The Rum of Cuba"). HCI's advertising also stresses the product's Cuban origin.
 
 
 12
 Beginning in 1995, Bacardi-Martini's predecessor-in-interest, Galleon S.A., produced rum in the Bahamas bearing the "Havana Club" name, and distributed sixteen cases of this rum in the United States. From May 1996 to August 1996, Bacardi distributed an additional 906 cases of "Havana Club" rum in the United States.
 
 
 13
 The pending lawsuit. In December 1996, HCH and HCI filed the instant action to enjoin Bacardi from using the "Havana Club" trademark, alleging violations of sections 32 and 43(a) of the Trademark Act of 1946 ("Lanham Act"), as amended, 15 U.S.C. 1114, 1125(a). Among Bacardi's defenses was a claim that OFAC's specific license to HCH, authorizing the assignments of the U.S. trademark, was invalid because HCH obtained the mark by fraud. In March 1997, the District Court ruled that Bacardi lacked standing to challenge OFAC's specific license to HCH and that OFAC's decision to grant the specific license was unreviewable. SeeHavana Club Holding, S.A. v. Galleon, S.A., 961 F. Supp. 498 (S.D.N.Y. 1997) ("Havana Club I").
 
 
 14
 In August 1997, the District Court ruled that HCH had no rights to the "Havana Club" trademark because the specific license to assign the mark to HCH had been nullified by OFAC's revocation of the specific license and because the CACR's general license authority under 31 C.F.R. 515.527(a) did not authorize the assignment. See Havana Club Holding, S.A. v. Galleon, S.A., 974 F. Supp. 302, 306-07 (S.D.N.Y. 1997) ("Havana Club II").[2] After rejecting the Appellants' claim of rights to the "Havana Club" mark, the Court granted the Appellants' motion to amend their Complaint to assert rights to the "Havana Club" trade name under sections 44(g) & 44(h) of the Lanham Act, as amended, 15 U.S.C. 1126(g), (h), and Chapter III of the General Inter-American Convention for Trade Mark and Commercial Protection, Feb. 20, 1929, 46 Stat. 2907, 2926-30 ("IAC"). Both Cuba and the United States are signatories to the IAC. SeeIAC, 46 Stat. at 2907. The District Court subsequently dismissed several counterclaims. SeeHavana Club Holding, S.A. v. Galleon, S.A., No. 96 CIV. 9655(SAS), 1998 WL 150983 (S.D.N.Y. Mar. 31, 1998) ("Havana Club III").
 
 
 15
 During the bench trial, the District Court ruled that HCH, a Luxembourg corporation, could not claim rights to trade name protection under the IAC because Luxembourg was not a party to the IAC. SeeHavana Club Holding, S.A. v. Galleon, S.A., 62 F. Supp. 2d 1085, 1089 (S.D.N.Y. 1999) ("Havana Club IV"). After trial, the District Court ruled that it was prohibited from enforcing HCI's trade name rights under the IAC by section 211(b) of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub. L. No. 105-277, 211(b), 112 Stat. 2681, 2681-88 (1998) ("Omnibus Act"), which Congress enacted on October 21, 1998. See Havana Club IV, 62 F. Supp. 2d at 1091-95.
 
 
 16
 The District Court also ruled that HCI lacked standing to assert its claim under section 43(a) of the Lanham Act. HCI had alleged that Bacardi's use of the mark "Havana Club" and its label--which features a sketch of Malecon, a seafront boulevard in Havana--falsely designated Cuba as the place of origin of Bacardi's rum, when in fact Bacardi produced it in the Bahamas. The District Court held that HCI had no standing to pursue this claim, because the Cuban embargo prevented HCI from selling its rum in the United States, and thereby from suffering commercial injury because of Bacardi's actions. The District Court added, "Any competitive injury plaintiffs will suffer based upon their intent to enter the U.S. market once the embargo is lifted is simply too remote and uncertain to provide them with standing." Havana Club IV, 62 F. Supp. 2d at 1099. An amended judgment was entered on June 28, 1999.
 
 Discussion
 I. Trademark
 
 17
 HCH contends that Bacardi infringed its rights to the "Havana Club" trademark registered in the United States. The basic issue on the trademark claim is whether HCH has any rights to the mark. Although HCH purported to acquire rights by assignments from Cubaexport to HR&L and from HR&L to HCH, HCH recognizes that to have enforceable rights in the United States, it must find authority for the assignment somewhere in United States law, because in the absence of such authority, the Cuban embargo renders null and void the transfer of trademark registrations in which a Cuban national or entity has an interest.[3]
 
 
 18
 As authority for the assignments, HCH's Complaint in this litigation initially invoked the "specific" license issued by OFAC in November 1995, which "licensed" the assignments. However, after OFAC revoked the specific license in 1997, HCH has relied on the "general" licensing authority in 31 C.F.R. 515.527.[4] Section 515.527(a) states: Transactions related to the registration and renewal in the United States Patent and Trademark Office ... in which ... a Cuban national has an interest are authorized.
 
 
 19
 31 C.F.R. 515.527(a)(1) (emphasis added). This provision was added in 1995, more than a year after HCH became the assignee of the "Havana Club" trademark. See Certain Transactions With Respect To United States Intellectual Property, 60 Fed. Reg. 54,194, 54,196 (1995). HCH contends that, even though OFAC revoked the specific license to assign the "Havana Club" trademark, the assignments remain valid under the general authorization of section 515.527(a)(1) as transactions "related to" the registration and renewal of a trademark. HCH also contends that if section 515.527(a)(1) is not construed to authorize the assignments, HCH will be denied treaty rights protected by the IAC. We disagree with both arguments.
 
 
 20
 (a) Whether the CACR prohibit the assignments. Before considering the meaning of section 515.527(a)(1), we encounter an express prohibition against HCH's claim set forth earlier in Subpart E of Part 515,[5] which contains section 515.527(a)(1). Section 515.502(a) provides:
 
 
 21
 No ... authorization contained in this part . . . shall be deemed to authorize or validate any transaction effected prior to the issuance thereof, unless such ... authorization specifically so provides.
 
 
 22
 31 C.F.R. 515.502(a) (emphasis added). The assignments for which HCH claims to find authorization in section 515.527 were "effected" in 1994, prior to the issuance of section 515.527 in 1995, see 60 Fed. Reg. 54,194, 54,196 (1995) (effective Oct. 17, 1995), and section 515.527(a)(1) does not "specifically so provide[]" for authorization of transactions that occurred prior to its issuance. Therefore, whether or not section 515.527(a)(1) might be interpreted to authorize assignments occurring after its effective date, this provision cannot authorize the 1994 assignments of the "Havana Club" trademark to HCH.[6]
 
 
 23
 Even if section 515.502(a) were not an obstacle, we would not accept HCH's argument that section 515.527(a)(1) should be interpreted to authorize the 1994 assignments as transactions "related to" a trademark renewal. Although phrases like "related to" are properly given a broad meaning in some statutes and regulations, see, e.g., Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96-97 (1983) (determining that a state law "relates to" employee benefit plans for purposes of ERISA preemption under 29 U.S.C. 1144(a)), the context in which the phrase is used illuminates its meaning. In Shaw, the ERISA context and the congressional purpose to achieve broad preemption warranted a broad reading of the phrase. By contrast, the context here precludes a broad reading. Section 515.527(a)(1) creates an exception to the broad prohibitions of the Cuban embargo. If every assignment of a trademark, for which the registration was subsequently renewed, were considered a transaction "related to" trademark renewal, the exception created by section 515.527(a)(1) would swallow much of the general rule of the Cuban embargo prohibiting transfers of trademarks.
 
 
 24
 Even if the text of section 515.527(a)(1) arguably applied to the assignments at issue, OFAC, the agency that promulgated the provision and that administers the Cuban embargo, interprets section 515.527 not to authorize assignments. R. Richard Newcomb, Director of OFAC, stated in a 1996 letter to Appellee's counsel that section 515.527
 
 
 25
 allows only for the registration and renewal of intellectual property; 515.527 does not convey to the registrant the authority to assign the registrant's interest in a patent, trademark, or copyright registered in the United States to another person. Such an assignment would require authorization by OFAC in the form of a specific license.... In the absence of OFAC authorization, the assignment of rights to the U.S.-registered trademark would be null and void.
 
 
 26
 Under this interpretation, only Cubaexport, the original registrant of the United States registration for the "Havana Club" trademark, has the authority to renew the "Havana Club" trademark, and a specific license is required in order to assign it.[7]
 
 
 27
 Article 11 of the IAC. HCH contends that failure to recognize its rights as assignee of the United States registration for the "Havana Club" trademark would nullify rights guaranteed by Article 11 of the IAC. Article 11 provides:
 
 
 28
 The transfer of the ownership of a registered or deposited mark in the country of its original registration shall be effective and shall be recognized in the other Contracting States, provided that reliable proof be furnished that such transfer has been executed and registered in accordance with the internal law of the State in which such transfer took place. Such transfer shall be recorded in accordance with the legislation of the country in which it is to be effective.
 
 
 29
 46 Stat. at 2922-24. Since the "Havana Club" mark registered in the United States was originally registered in Cuba and was transferred in accordance with Cuban law, Article 11 purports to assure that the transfer to HCH will be recognized in the United States. The disputed issue is whether the Cuban embargo has abrogated the rights that Section 11 of the IAC would otherwise protect.
 
 
 30
 A "treaty will not be deemed to have been abrogated or modified by a later statute unless such purpose on the part of Congress has been clearly expressed." Cook v. United States, 288 U.S. 102, 120 (1933) (emphasis added); seeTrans World Airlines, Inc. v. Franklin Mint Corp., 466 U.S. 243, 252 (1984);Chew Heong v. United States, 112 U.S. 536, 539-40 (1884). Although neither the CACR nor the LIBERTAD Act refers expressly to the IAC, the question of abrogation does not turn on whether the IAC has been expressly identified for abrogation. Congress is not required to investigate the array of international agreements that arguably provide some protection that it wishes to annul and then assemble a check-list reciting each one. What is required is a clear expression by Congress of a purpose to override protection that a treaty would otherwise provide.
 
 
 31
 With respect to the Cuban embargo, the purpose of Congress could not be more clear. Congress wished to prevent any Cuban national or entity from attracting hard currency into Cuba by selling, assigning, or otherwise transferring rights subject to United States jurisdiction. The CACR make this clear, and the LIBERTAD Act, by codifying the CACR, provides unmistakable evidence of congressional purpose. We must therefore accord primacy to the prohibition of the CACR that bars a Cuban national or entity from transferring a United States trademark.
 
 
 32
 HCH contends that since the "relates to" phrase of section 515.527(a)(1) could be interpreted to authorize the assignments at issue, the interpretation favoring HCH should be adopted in order to avoid a conflict with section 11 of the IAC. We disagree. First, that argument fails to reckon with the absolute prohibition of section 515.502(a), which prevents section 515.527(a)(1) from validating assignments that were made before the issuance of the latter provision. Second, wholly apart from section 515.502(a), section 515.527(a)(1) cannot be interpreted as HCH contends without substantially undermining the CACR's general prohibitions, as applied to United States trademarks. Thus, we would reject HCH's interpretation even if we did not have the benefit of OFAC's interpretation. Third, even if the interpretation of section 515.527(a)(1) were fairly debatable, the interpretation of the provision given by the agency charged with enforcing the embargo is normally controlling. See Auer v. Robbins, 519 U.S. 452, 461 (1997) (agency interpretation of its own regulation is "controlling unless plainly erroneous or inconsistent with the regulation") (internal quotation marks omitted); cf. Paradissiotis v. Rubin, 171 F.3d 983, 987 (5th Cir. 1999) (noting that OFAC's application of its own regulations deserves greater deference than under Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)); Consarc Corp. v. Iraqi Ministry, 27 F.3d 695, 702 (D.C. Cir. 1994) (same). Whether or not deference to an administrative agency's interpretation of its own provisions would override treaty provisions in other contexts, we have no doubt that Congress, whose purpose we are ultimately obliged to follow on this issue, expects that OFAC's restrictive interpretation of section 515.527(a)(1) will override any conflicting treaty protection.
 
 
 33
 Moreover, in 1996, after OFAC promulgated section 515.527, Congress clearly expressed its intent to prohibit transfers of property, including intellectual property, confiscated by the Cuban government by enacting the LIBERTAD Act. Finding that the Castro government was "offering foreign investors the opportunity to purchase an equity interest in, manage, or enter into joint ventures" involving confiscated property in order to obtain "badly needed financial benefit, including hard currency, oil, and productive investment and expertise," 22 U.S.C. 6081(5), (6), Congress established a civil remedy for any United States national owning a claim to "property" confiscated by the Cuban government after January 1, 1959, against "any person" who "traffics" in such property, id. 6082(a)(1)(A), and broadly defined "property" specifically to include "trademarks," id. 6023(12)(A). By doing so, Congress intended "to create a 'chilling effect' that will deny the current Cuban regime venture capital, discourage third-country nationals from seeking to profit from illegally confiscated property, and help preserve such property until such time as the rightful owners can successfully assert their claim," H. Rep. No. 104-202, at 25 (1996), reprinted in 1996 U.S.C.C.A.N. 527, 530 (emphasis added). In other words, Congress sought to discourage business arrangements like Cubaexport's joint venture with Pernod, the venture that led to both the creation of HCH and the assignments of a trademark confiscated by the Castro regime from JASA.[8]
 
 
 34
 By invoking the 1996 LIBERTAD Act as evidence of Congress's purpose to prohibit the assignments we do not retroactively apply that Act to prohibit the assignments in this case.[9] The 1994 assignments are unauthorized because OFAC revoked the specific license for them and the alleged source of a general licensing authority for them is unavailing. The LIBERTAD Act is simply evidence of congressional purpose that the result we reach should prevail over any contrary arguments, including those based on the IAC.
 
 
 35
 In the same vein, we note that Congress has recently explicitly spoken to restrict the scope of section 515.527. Section 211(a)(1) of the Omnibus Act provides:
 
 
 36
 Notwithstanding any other provision of law, no transaction or payment shall be authorized or approved pursuant to section 515.527 of title 31, Code of Federal Regulations, as in effect on September 9, 1998, with respect to a mark, trade name, or commercial name that is the same as or substantially similar to a mark, trade name, or commercial name that was used in connection with a business or assets that were confiscated unless the original owner of the mark, trade name, or commercial name, or the bona fide successorininterest has expressly consented.
 
 
 37
 112 Stat. at 2681-88. Section 515.527 has been amended to include this restriction. See31 C.F.R. 515.527(a)(2).
 
 
 38
 As with the LIBERTAD Act, we cite section 211(a)(1), not to apply its terms to invalidate the 1994 assignments (an arguably retroactive application), but only to indicate that interpreting section 515.527(a)(1) not to authorize the assignments fully vindicates Congress's purpose not to permit assignment of confiscated trademarks without the consent of the original owner. SeeWest Virginia University Hospitals, Inc. v. Casey, 499 U.S. 83, 100 (1991) ("Where a statutory term presented to us for the first time is ambiguous, we construe it to contain that permissible meaning which fits most logically and comfortably into the body of both previously and subsequently enacted law.") (emphasis added).
 
 
 39
 For all of these reasons, HCH has no enforceable rights to the "Havana Club" trademark.
 
 
 40
 II. Trade Name Protection Under the Inter-American Convention
 
 
 41
 HCI contends that Bacardi infringed its rights under the IAC to protection of the "Havana Club" trade name. The IAC provides that any manufacturer "domiciled or established" in a signatory country that uses a particular trade name or commercial name may enjoin the use of that name in another signatory country that is "identical with or deceptively similar to" its trade name. IAC, art. 18, 46 Stat. at 2928-30. A trade or commercial name need not be a registered to be protected. SeeIAC, art. 14, 46 Stat. at 2926.
 
 
 42
 Rights to trade names and commercial names arising under treaties may be asserted under section 44(b) of the Lanham Act, which provides:
 
 
 43
 Any person whose country of origin is a party to any convention or treaty relating to trademarks, trade or commercial names, or the repression of unfair competition, to which the United States is also a party . . . shall be entitled to the benefits of this section under the conditions expressed herein to the extent necessary to give effect to any provision of such convention, treaty or reciprocal law . . . .
 
 
 44
 15 U.S.C. 1126(b). Section 44(g) of the Lanham Act adds, "Trade names or commercial names of persons described in subsection (b) of this section shall be protected without the obligation of filing or registration whether or not they form parts of marks." Id. 1126(g). The terms "trade name" and "commercial name" are defined as "any name used by a person to identify his or her business or vocation." Id. 1127.
 
 
 45
 On October 21, 1998, before the bench trial in this case, Congress passed section 211 of the Omnibus Act, which provides in pertinent part:
 
 
 46
 (b) No U.S. court shall recognize, enforce or otherwise validate any assertion of treaty rights by a designated national or its successorininterest under sections 44 (b) or (e) of the Trademark Act of 1946 (15 U.S.C. 1126 (b) or (e)) for a mark, trade name, or commercial name that is the same as or substantially similar to a mark, trade name, or commercial name that was used in connection with a business or assets that were confiscated unless the original owner of such mark, trade name, or commercial name, or the bona fide successorininterest has expressly consented.
 
 
 47
 (c) The Secretary of the Treasury shall promulgate such rules and regulations as are necessary to carry out the provisions of this section.
 
 
 48
 (d) In this section:
 
 
 49
 (1) The term "designated national" has the meaning given such term in section 515.305 of title 31, Code of Federal Regulations, as in effect on September 9, 1998, and includes a national of any foreign country who is a successorininterest to a designated national.
 
 
 50
 (2) The term "confiscated" has the meaning given such term in section 515.336 of title 31, Code of Federal Regulations, as in effect on September 9, 1998.
 
 
 51
 112 Stat. at 2681-88.
 
 
 52
 Section 211(b) applies in this case.[10] This Court is a "U.S. court" under section 211(b).[11] HCI is a "designated national" under section 211(b) because HCI is organized under the laws of Cuba, is domiciled in Cuba, and has its principal place of business in Cuba. See31 C.F.R. 515.305 (defining "designated national" to mean "Cuba and any national thereof including any person who is a specially designated national").
 
 
 53
 Applying section 211(b), the District Court ruled that it precluded HCI's assertion of treaty rights under sections 44(b) or (e) of the Lanham Act and thereby precluded HCI's claims under the IAC. HCI disputes this ruling on several grounds. HCI first argues that it does not need sections 44(b) and (e) of the Lanham Act to assert its rights under the IAC because upon ratification, the IAC became law in the United States without the aid of additional legislation. SeeBacardi Corp. of America v. Domenech, 311 U.S. 150, 161 (1940). This argument presumes that when Congress enacted section 44(b) of the Lanham Act, it intended to incorporate into law only those treaties that were not self-executing at the time.
 
 
 54
 The original text of section 44(b) and the legislative history, however, suggest otherwise. When enacted in 1946, section 44(b) of the Lanham Act specifically incorporated the treaty rights of
 
 
 55
 [p]ersons who are nationals of, domiciled in, or have a bona fide and effective business or commercial establishment in any foreign country, which is a party to (1) the International Convention for the Protection of Industrial Property . . . or (2) the General Inter-American Convention for Trade Mark and Commercial Protection . . . or (3) any other convention or treaty relating to trade-marks, trade or commercial names, or the repression of unfair competition to which the United States is a party . . . .
 
 
 56
 Trademark Act of 1946, ch. 540, 44(b), 60 Stat. 427, 442 (emphasis added).[12] Although the Supreme Court had already ruled the IAC to be self-executing, see Bacardi Corp., 311 U.S. at 161, Congress specifically referred to the IAC in section 44(b) because Congress simply was not sure whether trademark treaties had acquired the force of law. The Senate Report explained:
 
 
 57
 These conventions have been ratified, but it is a question whether they are self-executing, and whether they do not need to be implemented by appropriate legislation.
 
 
 58
 Industrialists in this country have been seriously handicapped in securing protection in foreign countries due to our failure to carry out, by statute, our international obligations.
 
 
 59
 S. Rep. No. 79-1333 (1946), reprinted in 1946 U.S. Code & Cong. Serv. 1274, 1276. Accordingly, Congress intended the Lanham Act "[t]o carry out by statute our international commitments to the end that American traders in foreign countries may secure the protection to their marks to which they are entitled." Id.(emphasis added). Indeed, referring specifically to "inter-American conventions," Congress aimed to eliminate "these sources of friction with our Latin-American friends" and "facilitate mutual trade in this hemisphere" by ensuring the protection of their trademark rights in the United States. Id.[13] Therefore, HCI must assert its rights under the IAC pursuant to section 44(b) of the Lanham Act.
 
 
 60
 Second, HCI argues that, because HCI's rights to the "Havana Club" trade name existed before Congress enacted section 211(b), the District Court improperly applied section 211(b) retroactively. To determine whether section 211(b) may apply retroactively, we would normally first inquire "whether Congress has expressly prescribed the statute's proper reach." Landgraf v. USI Film Products, 511 U.S. 244, 280 (1994). Since section 211 does not clearly indicate that it should be applied retroactively, the traditional presumption against retroactivity would likely apply. See id.
 
 
 61
 In this case, however, we can apply section 211(b) to bar relief on HCI's trade name claim because when an "intervening statute authorizes or affects the propriety of prospective relief, application of the new provision is not retroactive." Id.at 273 (emphasis added); see American Steel Foundries v. Tri-City Central Trades Council, 257 U.S. 184, 201 (1921) (applying Clayton Act to injunction entered before its enactment because "relief by injunction operates in futuro and the right to it must be determined as of the time of the hearing"); Duplex Printing Press Co. v. Deering, 254 U.S. 443, 464 (1921) (same); Salute v. Stratford Greens Garden Apartments, 136 F.3d 293, 298 n.2 (2d Cir. 1998) ("When an intervening repeal of a statute affects the propriety of prospective relief, a court should apply the law in effect at the time it renders its decision."). Because HCI seeks only injunctive relief, this Court can properly apply section 211(b).
 
 
 62
 Third, HCI argues that section 211(b) does not apply when the trade name at issue has been abandoned. Section 211(b) precludes enforcement of rights under section 44(b) for a trade name "that was used in connection with a business or assets that were confiscated unless the original owner of such mark, trade name, or commercial name, or the bona fide successorininterest has expressly consented." 112 Stat. at 2681-88. By "confiscated," section 211(b) refers to the nationalization, expropriation, or other seizure of property by the Cuban Government on or after January 1, 1959. See31 C.F.R. 515.336. It is undisputed that JASA used the "Havana Club" name until the Cuban government expropriated the business in 1960 and has not expressly consented to HCI's use of the "Havana Club" name.
 
 
 63
 Nevertheless, HCI argues that JASA had abandoned its rights to the "Havana Club" trade name long before HCI started to use the name (as "Havana Club International") in 1994. Despite the lack of an explicit abandonment defense, HCI urges this Court to construe section 211(b) to include an abandonment exception because (1) interpreting section 211(b) otherwise would abrogate the IAC, and (2) abandonment, as a defense that arises out of common law, must not be presumed to be abrogated by section 211(b) absent express indication of Congress's intent to do so. However, we will not create an abandonment exception to section 211(b). Section 211(b) requires only that a trade name "was used" in connection with a confiscated business or asset, not that the trade name continues to be used. See United States v. Wilson, 503 U.S. 329, 333 (1992) ("Congress' use of a verb tense is significant in construing statutes."). Moreover, Congress knows how to enact an abandonment defense; it has already provided conditions under which any trademark, service mark, collective mark, or certification mark shall be deemed abandoned. See15 U.S.C. 1127. It is not likely that Congress wished to disadvantage a company that understandably ceased to use its trade name after the confiscation of its business.
 
 
 64
 Fourth, HCI argues that it should be allowed to prove that the "Havana Club" trade name was never confiscated. Section 211(d)(2), incorporating by reference 31 C.F.R. 515.336, defines "confiscated," in pertinent part, as property nationalized, expropriated, or otherwise seized by the Cuban government on or after January 1, 1959, "[w]ithout the property having been returned or adequate and effective compensation provided," 515.336(a)(1). See112 Stat. at 2681-88. The District Court found that "all of JASA's assets were taken and that it received no compensation." Havana Club Holding IV, 62 F. Supp. 2d at 1095 n.8.
 
 
 65
 HCI argues that it had no opportunity to conduct discovery to determine whether JASA had a positive net value at the time of expropriation, because Congress did not enact section 211 until well into the proceedings, and because the District Court implicitly denied its motion to conduct discovery on the matter by applying section 211.
 
 
 66
 We disagree with HCI's premise that no compensation is "adequate and effective" compensation under section 515.336(a)(1) where the confiscated business allegedly had no positive net value at the time of expropriation. The embargo's definition of confiscated property contemplates only three ways in which property expropriated by Cuba can avoid becoming classified as "confiscated." Cuba can either return the property, provide "adequate and effective compensation," or settle the property claim pursuant to an international claims settlement agreement or other mutually accepted settlement procedure. See31 C.F.R. 515.336(a). Where Cuba has not returned JASA's property, not made even a gesture toward compensation, and not settled the claim, the confiscation inquiry ends.
 
 III. False Advertising
 
 67
 HCI disputes the District Court's finding that it does not have standing to assert its "false advertising" claim. Section 43(a) of the Lanham Act provides:
 
 
 68
 Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
 
 
 69
 (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ...
 
 
 70
 shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.
 
 
 71
 15 U.S.C. 1125(a)(1). To establish standing under section 43(a), the plaintiff must
 
 
 72
 demonstrate a "reasonable interest to be protected" against the advertiser's false or misleading claims, and a "reasonable basis" for believing that this interest is likely to be damaged by the false or misleading advertising. The "reasonable basis" prong embodies a requirement that the plaintiff show both likely injury and a causal nexus to the false advertising.
 
 
 73
 Ortho Pharmaceutical Corp. v. Cosprophar, Inc., 32 F.3d 690, 694 (2d Cir. 1994) (citations omitted). "Although a section 43 plaintiff need not be a direct competitor, it is apparent that, at a minimum, standing to bring a section 43 claim requires the potential for a commercial or competitive injury." Berni v. International Gourmet Restaurants of America, Inc., 838 F.2d 642, 648 (2d Cir. 1988) (citations omitted); see, e.g., National Lampoon, Inc. v. American Broadcasting Cos., 376 F. Supp. 733, 746-47 (S.D.N.Y.) (publisher of National Lampoon magazine has standing to sue television network's use of part of its name on two television programs, in part because plaintiff "has begun production of programs for closed-circuit television and is negotiating for production of a special program" to sell to one of the television networks), aff'd, 497 F.2d 1343 (2d Cir. 1974).
 
 
 74
 This Court reviews de novo the District Court's determination of standing. See Devlin v. Transportation Communications International Union, 175 F.3d 121, 131 (2d Cir. 1999). Contrary to the case law on standing under section 43(a), HCI first argues that to obtain standing, it must demonstrate only that Bacardi has falsely indicated the origin of its "Havana Club" rum as Havana, when in fact Bacardi produced its rum in the Bahamas. HCI points to the original language of section 43(a) of the Lanham Act, which provided:
 
 
 75
 Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin . . . shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.
 
 
 76
 60 Stat. at 441 (1946) (emphasis added). HCI argues that, by using the disjunctive "or," Congress contemplated that a plaintiff could sue under section 43(a) if it did business in the locality falsely designated as the origin of a particular good, regardless of whether that plaintiff was likely to be damaged by the false representation. Although Congress amended section 43(a) in 1988, the Senate Report stated that standing "should continue to be decided on a case-by-case basis, and that the amendments . . . made to the legislation with respect to [this issue] should not be regarded as either limiting or extending applicable decisional law." S. Rep. No. 100-515, at 41 (1988), reprinted in 1988 U.S.C.C.A.N. 5577, 5604. Therefore, HCI argues, it has standing under the current version of section 43(a), because HCI does business "in the locality falsely indicated as that of origin" by Bacardi, namely, Havana.
 
 
 77
 We disagree. The Senate Report indicates that Congress intended not to alter the then "applicable decisional law" under section 43(a). Although numerous cases prior to 1988 recognized that standing under section 43(a) required demonstrable proof that a plaintiff would be likely to suffer damage as a result of false advertising, see, e.g., Johnson & Johnson v. Carter-Wallace, Inc., 631 F.2d 186, 190 (2d Cir. 1980) ("[T]he likelihood of injury and causation will not be presumed, but must be demonstrated."), we have found no case decided before 1988 that recognized standing under section 43(a) based on HCI's interpretation of the pre-1988 version of section 43(a). Since no such case existed, Congress cannot be deemed to have left unaltered, and by implication recognized, HCI's theory of standing when it amended section 43(a) in 1988. The parties in the cases relied upon by HCI could have demonstrated likelihood of injury because they competed with each other in the same geographic area. See Black Hills Jewelry Manufacturing Co. v. Gold Rush, Inc., 633 F.2d 746, 748 (8th Cir. 1980) (the Dakotas); Scotch Whiskey Association v. Barton Distilling Co., 489 F.2d 809, 811 (7th Cir. 1973) (Panama, including Canal Zone).
 
 
 78
 Second, to establish the likelihood of commercial injury for the purposes of standing, HCI argues that Bacardi's use of the "Havana Club" name will adversely affect HCI's current and future sales of its rum to U.S. visitors to Cuba. The fact that HCI sells to Americans traveling in Cuba, however, does not necessarily demonstrate the likelihood that the distribution of Bacardi's "Havana Club" rum in the United States will hurt HCI sales to those persons in Cuba. Although HCI presented consumer surveys that reported that "33% of Americans think that it is legal to sell rum from Cuba in the United States and 9% do not know whether it is legal or illegal," the District Court noted that "it is intuitively doubtful that these finding[s] would apply to U.S. travelers authorized to visit Cuba." Havana Club Holding IV, 62 F. Supp. 2d at 1100 n.11. We will not disturb this finding on appeal. A district court has broad discretion concerning the weight of particular evidence, including consumer surveys such as those proffered here, see Schering v. Pfizer, Inc., 189 F.3d 218, 230 (2d Cir. 1999); Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons, 523 F.2d 1331, 1341 (2d Cir. 1975), and its findings of fact are reviewed for clear error. In this case, the plaintiffs' consumer surveys drew their sample from across the United States, without attempting to control for any likelihood that the participants would travel to Cuba. Under such circumstances, the District Court's finding that these surveys did not show consumer confusion among the relevant class of travelers was not clearly erroneous.
 
 
 79
 HCI further argues that this Court must presume harm because Bacardi intentionally copied the "Havana Club" label, citing Paddington Corp. v. Attiki Importers & Distributors, Inc., 996 F.2d 577, 586-87 (2d Cir. 1993) ("Where a second-comer acts in bad faith and intentionally copies a trademark or trade dress, a presumption arises that the copier has succeeded in causing confusion."). However, Paddington and the other cases HCI cites are inapposite because they involve trademark claims, not false advertising claims.
 
 
 80
 Third, HCI argues that the District Court erred in finding HCI's ability to enter the U.S. market to be too remote at this point to confer standing. Although this Court has conferred standing for section 43(a) claims based on a showing of potential commercial injury, not all potential commercial injuries are sufficient to confer standing. See, e.g., PDK Labs, Inc. v. Friedlander, 103 F.3d 1105, 1112 (2d Cir. 1997) (hopes of holder of patent for weight loss method, who had marketed his product only to potential investors, to obtain FDA approval and then sell product to public too remote to confer standing to challenge defendant's advertising).
 
 
 81
 HCI characterizes its injuries as (1) the "lost ability to use the HAVANA CLUB name in the U.S. through Bacardi's accumulation of rights-by-use," (2) "loss of the key selling points in the U.S. of being the single source of both HAVANA CLUB rum and Cuban-origin rum," and (3) "damaged reputation of Cuban-origin rum," or more generally, "the imminent loss of their prime selling advantage." Brief for Appellants at 25. Even if HCI competes with Bacardi in markets elsewhere in the world, standing requires that HCI demonstrate at least potential commercial injury in the United States, because Bacardi sells "Havana Club" rum only in the United States. Because HCI's rum does not now compete with Bacardi's rum in the United States, HCI's alleged injury amounts to the present diminution in the speculative value of its sales of Cuban-origin rum in the United States market once the United States government removes the obstacle of the Cuban embargo.
 
 
 82
 That obstacle is formidable. The LIBERTAD Act not only codified the economic embargo of Cuba, see22 U.S.C. 6032(h), and strengthened its measures, see id. 6033-6046, but also authorized the President to take steps to suspend the embargo only after determining that a "transition government in Cuba is in power,"id. 6064(a), and authorized the President to take steps to terminate the embargo only after determining that "a democratically elected government in Cuba is in power," id. 6064(c).[14] At this time, the President has not determined that a "transition government," let alone a "democratically elected" government, exists in Cuba.
 
 
 83
 HCI points to recent efforts in Congress to pass legislation to lift portions of the Cuban embargo. However, by conferring standing to HCI based on its own prediction of Congress's actions, this Court would expand its authority well beyond any zone of twilight that might exist between legislative and judicial authority.
 
 
 84
 HCI also seeks to support standing by relying on G. H. Mumm Champagne v. Eastern Wine Corp., 142 F.2d 499 (2d Cir. 1944), and section 10(g) of the TWEA. Its arguments are unavailing. Mumm is a pre-Lanham Act action to enjoin trademark infringement and unfair competition, not a false advertising action, and its facts are readily distinguishable from those in this case. In Mumm, a French company had registered the trademarks at issue and had contracted with a Delaware company in 1938, prior to World War II, to sell only the French company's champagne.[15] Seeid.at 500. After upholding the Delaware company's entitlement to an injunction, the Court considered "the rather barren question" whether to uphold its right to obtain an injunction on behalf of the French company, "barren, because one injunction is as good as two." Id. at 502. Despite the lack of significance of an injunction on behalf of the French company, we affirmed it because the infringement risked lost sales in the United States by the Delaware company, which might have resulted in lost profits by the French company "provided sales lost by the Delaware company resulted in sales lost by it to that company."[16] Id. In the pending case, however, unlike the French company in Mumm, HCI has no United States partner selling its product in the United States, and therefore no loss of profits derived indirectly from lost sales in the United States will occur.
 
 
 85
 Nor does section 10(g) itself aid HCI. Section 10(g) provides that "[a]ny enemy, or ally of enemy, may institute and prosecute suits in equity ... to enjoin infringement of letters patent, trade-mark, print, label, and copyrights in the United States owned or controlled by said enemy or ally of enemy, in the same manner and to the extent that he would be entitled so to do if the United States was not at war." 50 U.S.C. app. 10(g). HCI does not contend that it may sue under section 10(g); in the absence of a state of war with Cuba, HCI is not an "enemy."[17] Nevertheless, it argues that if its section 43(a) claim is rejected for lack of standing, then section 10(g) could not be used by those plaintiffs within the section's coverage. The argument does not help HCI.
 
 
 86
 In the first place, section 10(g) would not apply to a false designation of origin claim under section 43(a) of the Lanham Act. A plaintiff need not "own[] or control[]" a registered trademark to bring a section 43(a) action. Any rum producer selling its product in the United States can obtain standing to complain about Bacardi's allegedly false designation of origin as long as it can demonstrate the commercial injury required for an action under section 43(a).
 
 
 87
 Secondly, to the extent that HCI analogizes false designation claims to trademark infringement claims, section 10(g) provides no escape from traditional standing requirements. Section 10(g) permits a covered plaintiff to institute an infringement action "to the extent that he would be entitled so to do if the United States was not at war." Thus, a section 10(g) plaintiff would have to demonstrate the competitive injury necessary to establish standing for an infringement action in the absence of a wartime embargo. Although an embargo might make it more difficult for such a plaintiff to show such injury, a company in an embargoed country still might, in some circumstances, suffer sufficient risk of competitive harm, due to a defendant's infringement, to obtain an injunction. See Mumm, 142 F.2d at 502. In such circumstances, section 10(g) would allow the plaintiff to go forward with its action. However, where, as here, the plaintiff cannot establish injury for a false designation claim, comparison to section 10(g) affords it no refuge from traditional standing requirements.
 
 IV. Unfair Competition
 
 88
 Finally, HCI argues that it has standing to sue under section 44(h) of the Lanham Act for unfair competition. Section 44(h) provides
 
 
 89
 Any person designated in subsection (b) of this section as entitled to the benefits and subject to the provisions of this chapter shall be entitled to effective protection against unfair competition, and the remedies provided in this chapter for infringement of marks shall be available so far as they may be appropriate in repressing acts of unfair competition.
 
 
 90
 15 U.S.C. 1126(h). Rights under Section 44(h) are co-extensive with treaty rights under section 44(b), including treaty rights "relating to . . . the repression of unfair competition."[18] Id. 1126(b). SeeToho Co. v. Sears, Roebuck & Co., 645 F.2d 788, 792 (9th Cir. 1981) ("The grant in subsection (h) of effective protection against unfair competition is tailored to the provisions of the unfair competition treaties by subsection (b), which extends the benefits of section 44 only to the extent necessary to give effect to the treaties."); American Auto. Ass'n v. Spiegel, 205 F.2d 771, 774 (2d Cir. 1953) ("Since [section 44(h)] is limited to 'person designated in subsection (b)', we look to that subsection to learn its scope.").
 
 
 91
 HCI essentially argues that it must demonstrate less to obtain standing to assert its section 44(h) claim than is required for its section 43(a) claim. Article 21(c) of the IAC defines an act of "unfair competition" to include "[t]he use of false indications of geographical origin or source of goods, by words, symbols, or other means which tend in that respect to deceive the public in the country in which these acts occur." 46 Stat. at 2932. We note, however, that article 21 of the IAC authorizes the prohibition of its specified acts of unfair competition "unless otherwise effectively dealt with under the domestic laws of the Contracting States," 46 Stat. at 2932. HCI's section 44(h) claim amounts to little more than the re-assertion of its section 43(a) claim, because article 21(c) of the IAC prohibits a subset of the conduct already effectively prohibited under American law by section 43(a). We therefore conclude as a matter of law that HCI has failed to state a viable claim under section 44(h).[19]
 
 Conclusion
 
 92
 The judgment of the District Court is affirmed.
 
 
 
 Notes:
 
 
 [1]
 The CACR authorizes both "general" licenses, see 31 C.F.R. 515.317, which permit classes or categories of transactions with Cuban nationals, see, e.g., id. 515.542(a) (common carriers of mail), and "specific" licenses, see id. 515.318, which require individualized determinations and approvals by OFAC, see, e.g., id. 515.521 (authorizing specific licenses to unblock shares of qualifying United States permanent residents in "U.S.-located assets" of Cuban corporations).
 
 
 [2]
 Although acknowledging that the nullification of the assignment caused the rights in the mark to revert to Cubaexport, the assignor, the District Court did not cancel the United States registration for "Havana Club" because Cubaexport was not a party to the litigation. See id. at 311-12.
 
 
 [3]
 Unless authorized, the Cuban embargo prohibits, with respect to property in which a Cuban national or entity has an interest, (1) "[a]ll dealings in, including, without limitation, transfers . . . of, any property . . . or evidences of ownership of property by any person subject to the jurisdiction of the United States"; (2) "[a]ll transfers outside the United States with regard to any property or property interest subject to the jurisdiction of the United States"; and (3) "[a]ny transaction for the purpose or which has the effect of evading or avoiding any of the prohibitions" above. 31 C.F.R. 515.201(b), (c).
 These prohibitions apply where a Cuban national or entity has an interest of "any nature whatsover, direct or indirect," in the property transferred. Id. 515.312. The embargo defines "property" to include trademarks, see id. 515.311, and specifically defines "transfer" to include "the making, execution, or delivery of any assignment," id. 515.310. Any transfer of property in violation of the Cuban embargo "is null and void and shall not be the basis for the assertion or recognition of any interest in or right, remedy, power or privilege with respect to such property." Id. 515.203(a).
 
 
 [4]
 The Appellants' initial brief in this Court implies some reliance on the special license by asserting that "cancellation of HCH's interest in the Registration" violates treaty rights under the IAC, see Brief for Appellants at 55, suggesting that the cancellation, if unlawful, leaves the special license in force. We consider the IAC issue below. However, the reply brief unequivocally asserts, "The core issue is whether the CACR general license covers the transfer . . . ." Reply Brief for Appellants at 26.
 
 
 [5]
 The CACR constitute Part 515 of Chapter V (Office of Foreign Assets Control, Department of the Treasury) in Subtitle B of Title 31 of the Code of Federal Regulations.
 
 
 [6]
 If HCH were to meet the obstacle of section 515.502(a) by obtaining assignments of the "Havana Club" trademark from Cubaexport now (after issuance of section 515.527(a)(1)), it would encounter the further obstacle of section 211(a)(1) of the Omnibus Act, discussed below, which, without any issue as to retroactivity, would prohibit future assignments of confiscated trademarks without the consent of the original owner.
 
 
 [7]
 The Appellants inform us that HCH and HR&L have applied to OFAC for a second specific license, following revocation of the first specific license. See Reply Brief for Appellants at 31.
 
 
 [8]
 We need not determine whether JASA abandoned the "Havana Club" mark by not renewing that mark with the USPTO after the United States imposed the Cuban embargo. We note, however, that in 1962, two years after Cuba expropriated JASA's assets, Congress amended the Lanham Act to allow applications for renewing registered trademarks to show that "any nonuse" of the mark "is due to special circumstances which excuse such nonuse and it is not due to any intention to abandon the mark." Act of Oct. 9, 1962, Pub. L. No. 87-772, 5, 76 Stat. 769, 770.
 
 
 [9]
 Although a statute could be prospectively applied to bar an injunctive remedy with respect to a previously acquired property, it would arguably encounter retroactivity objections if applied, of its own force, to invalidate a prior acquisition. See generally Landgraf v. USI Film Products, 511 U.S. 244 (1994).
 
 
 [10]
 Congress may "amend substantive law in an appropriations statute, as long as it does so clearly." Robertson v. Seattle Audubon Society, 503 U.S. 429, 440 (1992). The Appellants argue that this Court must presume that Congress intended section 211(b) to expire at the end of the 1999 fiscal year because it did not clearly indicate its intent to permanently amend the law. We disagree. If Congress had intended section 211 to expire at the end of the fiscal year, section 211(c), which directs the Secretary of Treasury to promulgate rules and regulations to carry out its provisions, would have been superfluous.
 
 
 [11]
 It is unclear whether "U.S. court" in section 211(b) means only a federal court or any court in the United States that would otherwise have concurrent jurisdiction over Lanham Act claims, such as a state court, see Berlitz Schools of Languages of America, Inc. v. Everest House, 619 F.2d 211, 216 (2d Cir. 1980). The term "U.S. court" closely resembles the term "court of the United States," which Congress has used to distinguish federal courts from other forums, especially in statutes that expressly identify both federal and state courts. See, e.g., 22 U.S.C. 2459(a) ("no court of the United States, any State, the District of Columbia, or any territory or possession of the United States" may deprive a cultural or educational institution of any work of art of other object imported into the United States for exhibition if determined by the President to have cultural significance). Because the Cuban embargo significantly implicates United States foreign policy, however, it is unlikely that Congress intended to preclude the ability of plaintiffs to assert in federal court rights derived from property confiscated by Cuba, but preserve their ability to do so in state court. Because this Court is clearly a "U.S. court," we need not decide whether section 211(b) also precludes HCI from asserting its claims under the IAC in state court.
 
 
 [12]
 In 1962, Congress amended section 44(b) to exclude the references to the two specific treaties, see 20, 76 Stat. at 774, presumably in an effort to "revis[e] the language to a more understandable form," S. Rep. No. 87-2107 (1962), reprinted in 1962 U.S.C.C.A.N. 2844, 2851.
 
 
 [13]
 Cf. Vanity Fair Mills, Inc. v. T. Eaton Co., 234 F.2d 633, 641 (2d Cir. 1956)(noting that in trademark dispute involving sales of allegedly infringing goods in Canada, the only rights plaintiff could assert under the International Convention for the Protection of Industrial Property "other than through 44 of the Lanham Act . . . are derived from . . . Canadian law, and not from the fact that the International Convention may be a self-executing treaty which is a part of the law of this country")(emphasis added).
 
 
 [14]
 The Act defines "a transition government" in Cuba as one that has, among other things, legalized all political activity, released all political prisoners, publicly committed to organizing and timely implementing "free and fair elections," ceased interference with Radio Marti or Television Marti broadcasts, has publicly committed to and demonstrated progress in establishing an independent judiciary and allowing for the establishment of independent trade unions and independent social, economic, and political associations, and "does not include Fidel Castro or Raul Castro." 22 U.S.C. 6065(a).
 
 
 [15]
 In the contract, the French company agreed that it alone would protect and enforce its trademark rights in the United States. See id. at 502. Soon thereafter, as the district court in Mumm explained, France was "occupied by the armed forces of the German Reich . . . . Because of conditions due to the existing war, the [Delaware company] is, and has been, unable to communicate with the [French company]." G. H. Mumm Champagne v. Eastern Wine Corp., 52 F. Supp. 167, 169-70 (S.D.N.Y. 1943). Observing that the war had made "impossible the performance of that promise" by the French company to protect its marks, we construed the contract to authorize the Delaware company, under those circumstances, to seek to enjoin trademark infringement on the French company's behalf. Mumm, 142 F.2d at 502. Although we referred to sections 10(g) and (h) of the TWEA, 50 U.S.C. app. 10(g), (h), we did so only to note that the TWEA did not preclude the Delaware company's limited authority under the contract to seek to enjoin trademark infringement on the French company's behalf. See Mumm, 142 F.2d at 503.
 
 
 [16]
 Whether the possibility of lost profits by the French company might have resulted from loss of an increase in its account with the Delaware company as the latter depleted its stock of pre-war imported champagne, or from some other arrangement is not indicated in the Court's opinion.
 
 
 [17]
 Section 10(g) applies to "[a]ny enemy[] or ally of enemy." When Congress enacted the TWEA, six months after the United States entered World War I, see Act of Oct. 6, 1917, ch. 106, 40 Stat. 411, "enemy" was defined to include any resident or corporation of, or any foreign resident or corporation doing business in, any nation "with which the United States is at war," 2, 40 Stat. at 411. In 1933, Congress amended section 5(b) of the TWEA to authorize the President to act under section 5(b) "[d]uring time of war or during any other period of national emergency declared by the President," Act of Mar. 9, 1933, ch. 1, sec. 2, 5(b), 48 Stat. 1, 1 (emphasis added). In 1977, Congress removed the President's authority to act under section 5(b) in a declared national emergency, see Act of Dec. 28, 1977, Pub. L. No. 95-223, 101(a), 91 Stat. 1625, 1625, but still permitted the President to continue to exercise the authorities conferred under section 5(b) "which were being exercised with respect to a country on July 1, 1977, as a result of a national emergency declared by the President before such date," 101(b), 91 Stat. at 1625. This grandfather clause preserved the President's authority to maintain the Cuban embargo under section 5(b). See Regan v. Wald, 468 U.S. 222, 232 (1984). In contrast, Congress has never amended section 10(g) to authorize actions by persons or entities other than "[a]ny enemy, or ally of enemy."
 
 
 [18]
 If the unfair competition claim were viable, it would not encounter the obstacle of section 211(b) of the Omnibus Act, which does not expressly preclude a court from enforcing treaty rights under section 44(b) relating to the repression of unfair competition.
 
 
 [19]
 HCI also argues that it has an independent basis for standing under article 23 of the IAC. See 46 Stat. at 2934 ("Repression of False Indications of Geographical Origin or Source"). HCI cannot rely on this provision in asserting its section 44(h) claim, however, because the IAC does not treat rights under article 23 as rights related to the repression of unfair competition. Because HCI never properly pled a cause of action invoking article 23 of the IAC, we decline to consider such a claim.